**Gloria WOLVOS, Appellant (Defendant Below),**

v.

**Steven M. MEYER, Appellee (Plaintiff Below).**

No. 71S05–9503–CV–376.

Supreme Court of Indiana.

July 12, 1996.

John C. Firth, Brent E. Inabnit, Sopko & Firth, South Bend, for appellant.

John C. Hamilton, Doran, Blackmond, Ready, Hamilton & Williams, Donald E. Wertheimer, South Bend, for appellee.

SELBY, Judge.

Two questions are presented in this appeal: (1) whether a real-estate option agreement between the parties is an "agreement to agree" or a binding contract under which the purchaser may seek specific performance, and (2) whether the trial court abused its discretion in denying the seller's motion for relief from judgment. We hold that the trial court did not err on either ground and we affirm the trial court's decision.

## FACTS

Gloria Wolvos ("Wolvos") is a licensed real-estate agent and broker. Dr. Steven M. Meyer ("Meyer") is a physician specializing in ophthalmology. (R. at 22). Meyer obtained a law degree in an effort to provide a medical malpractice consulting service, but he is not licensed to practice law in any state. (R. at 69). At the time they entered into the agreement, Wolvos had no knowledge of Meyer's law degree, and Meyer had no

knowledge of Wolvos' real estate license. Wolvos and Meyer negotiated directly with one another, without the involvement of an agent or attorney on either side.

On March 15, 1993, Wolvos and Meyer executed the following agreement:

The undersigned Gloria Wolvos, Owner of certain real eastate [sic] described hereafter, for the sum of $50.00, receipt of which is hereby acknowledged, hereby grants to and confers upon Steven M. Meyer M.D. as optionee an exclusive right and option to purchase certain real estate on the terms and conditions stated below, which real estate is commonly known as 332 North Michigan Street, South Bend, Indiana....

The terms and conditions controlling this potential acquisition of real estate by Meyer from Wolvos are:

1. The purchase price of the subject real estate shall be $160,000.00. The real estate shall be as described in the legal description above and shall include the building, parking lot, and sign all in the same condition that it is in currently.

2. The option shall remain in effect for 120 days.

3. Wolvos agrees that, as owner, she has the obligation to undertake, at her expense, an environmental study of the subject real estate which she shall order at the time this option agreement is executed and must be completed within 45 days. If said study reveals the existence of contamination and/or pollutants to an extent that EPA, city, county, or state standards and levels are violated and/or exceeded, then Wolvos shall correct and remedy such or any violations and excesses if optionee exercises option. If the cost of such correction is less than $10,000 then the purchase price shall be reduced by the amount less than $10,000 that Wolvos must spend.

4. Wolvos shall be given a six week period to undertake and complete such corrective and remedial work as necessitated and disclosed by the environmental report from the time Meyer exercises option. Meyer shall be given a copy of such environmental report at the same time Wolvos receives it.

5. The subject real estate, at the time of the closing of this transaction after this option is exercised shall be within EPA accepted and safe levels of all contaminants and pollutants and Wolvos shall present a statement from the EPA confirming this fact.

6. The exercise of this option shall be in writing and transmitted by Meyer to Wolvos at....

7. It is acknowledged by both parties that the subject of this option is confidential and optionee could be harmed by the disclosure of this information. Owner acknowledges this fact and agrees not to disclose the option or potential purchase to any other party.

8. At the time this option is exercised, the parties shall enter into a written purchase agreement on forms typically utilized by realtors and brokers in St. Joseph County. The closing shall be within 30 days after the necessary corrective and remedial EPA work has been completed. The manner of purchase shall be cash/conventional financing.

(R. at 8–9). Both Meyer and Wolvos signed this agreement. On May 11, 1993, within the 120 day period provided for in the option agreement, Meyer sent notice to Wolvos that he intended to exercise the option. (R. at 11, 58–59).

Thereafter, Wolvos obtained an estimate of $19,000 for environmental remediation of the property. On June 1, 1993, Wolvos' attorney wrote to Meyer asserting that the option agreement was an unenforceable agreement to agree, and extended to him a different offer of sale. Wolvos offered to sell the property to Meyer upon execution of a written purchase agreement providing: (1) a purchase price of $160,000; (2) earnest money of $8,000; (3) remediation would not begin until Meyer obtained "an unconditional written commitment for mortgage financing;" (4) Wolvos would pay up to $10,000 for remediation and Meyer would pay for all remediation in excess of $10,000; (5) Wolvos would not "be obligated to 'present a statement from the EPA' confirming any aspect of the environmental condition of the real estate;" (6) Wolvos would provide commitment for an

owner's policy of title insurance; (7) Meyer would provide any survey he desired at his own expense; and (8) real-estate taxes and assessments would be prorated as of the closing date. (R. at 12–13).

Meyer rejected these conditions, and brought this action for specific performance and for damages incurred by Meyer in reliance upon the agreement. Wolvos filed a counterclaim against Meyer for abuse of process. The trial court granted partial summary judgment on Meyer's specific performance claim, and ordered Wolvos to comply with the terms of the option agreement. (R. at 58–59).

Subsequently, Wolvos sought relief from the grant of partial summary judgment pursuant to IND.TRIAL RULE 60(B)(3), alleging that Meyer acted with unclean hands. In particular, Wolvos asserted that she learned for the first time after the summary judgment hearing that Meyer was a lawyer, that during negotiations Meyer had told Wolvos that they "did not need the assistance of a lawyer," and had Wolvos known Meyer was a lawyer, she "would have obtained a lawyer to review the Option Agreement." (R. at 60–62). After a hearing, the trial court denied Wolvos' motion for relief. In an unpublished opinion, the Court of Appeals reversed the grant of partial summary judgment to Meyer and remanded with instructions to enter summary judgment in favor of Wolvos. We granted Meyer's petition to transfer and now affirm the trial court.

## I

In an appeal from the grant of summary judgment, the reviewing court faces the same issues as the trial court, *Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514 (Ind.1994), as summary judgment is appropriate only if the pleadings and evidence show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R. 56(c). Thus, even though summary judgment is presumed to be valid and the appealing party bears the burden of persuasion, the appellate court follows the same process as the trial court. *Drake v. Mitchell,* 649 N.E.2d 1027 (Ind. 1995). The reviewing court must provide careful scrutiny of the trial court's determination, to assure that the non-prevailing party is not improperly denied his day in court. *Indiana Dept. of State Revenue v. Caylor–Nickel Clinic, P.C.,* 587 N.E.2d 1311 (Ind. 1992).

Option contracts are most commonly used in the sale of property. They are useful in situations where a potential purchaser is interested in the ownership of land, but "may not at the moment have the money to pay for it, or ... may not be sufficiently sure" of such interest for the potential purchaser to buy the land immediately. 1A ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 259 at 460 (1963). Instead, the potential purchaser pays a much smaller amount in order to convert the offer to sell into an irrevocable offer for a limited amount of time. The potential purchaser then has the specified length of time to decide whether to exercise the option. Upon timely exercise of the option, such agreements become enforceable contracts. *Id.*

In the present case, Wolvos argues that the agreement is not an option contract, but is simply an "agreement to agree," and thus is unenforceable. The law is well established that a mere agreement to agree at some future time is not enforceable. *See generally Wallace v. Mertz,* 86 Ind.App. 185, 156 N.E. 562 (1927). Wolvos argues that the language of paragraph eight of the agreement, "[a]t the time this option is exercised, the parties shall enter into a written purchase agreement," demonstrates that this option agreement was merely an agreement to agree since this language indicates that the parties contemplated further negotiations.

Nevertheless, parties may make an enforceable contract which obligates them to execute a subsequent final written agreement:

It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be

a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

1 ARTHUR LINTON CORBIN AND JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 at 133–34 (rev. ed. 1993) (footnotes omitted); *see also International Shoe Co. v. Lacy,* 114 Ind.App. 641, 53 N.E.2d 636 (1944). Our Court of Appeals more recently discussed this issue in *McMahan Construction Co. v. Wegehoft Bros., Inc.,* 170 Ind.App. 558, 354 N.E.2d 278 (1976), stating that "[a] well known rule provides that mere reference to a more formalized contract does not void the presently existing agreement."

■ The question of whether an agreement is an enforceable option contract or merely an agreement to agree involves two interrelated areas: "intent to be bound and definiteness of terms." *See generally* 1 ARTHUR LINTON CORBIN AND JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 at 131 (rev. ed. 1993). According to the Restatement (Second) of Contracts § 33 cmt. f (1979), "[p]romises may be indefinite.... The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable."

■ We first examine whether the parties intended to be bound by the agreement, or whether they intended that they would be bound only after executing a subsequent written document. When one enters into an agreement with the understanding that neither party is bound until a subsequent formal written document is executed, no enforceable contract exists until the subsequent document is executed.[1] *Foster v. United Home Improvement Co., Inc.,* 428 N.E.2d 1351, 1355 (Ind.Ct.App.1981) (citing *International*

*Shoe,* 114 Ind.App. 641, 53 N.E.2d 636; and *Avery v. Citizens' Loan & Trust Co.,* 94 Ind.App. 161, 180 N.E. 23 (1932)). In support of her contention that the parties did not intend to be bound, Wolvos relies upon paragraph eight of the agreement, which provides that the parties would enter into a subsequent written purchase agreement if and when Meyer exercised his option. Our Court of Appeals agreed, focusing on the phrase "enter into" to demonstrate that the parties intended to execute an agreement in the future. However, the language of the agreement as a whole, including paragraph eight, unambiguously establishes that the parties intended to be bound upon the exercise of the option. Although the parties provided for execution of a subsequent written agreement should Meyer elect to exercise his option under the contract, this by itself did not relieve Wolvos of her obligations to Meyer. Instead, paragraph eight bound the parties to execute a more formal writing, using a specified form, upon the exercise of the option.

■ We next turn to the question of whether the option agreement lacks such essential terms as to render the contract unenforceable. We have held that

> [t]he contract which is sought to be specifically executed, ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy.

*Burk v. Mead,* 159 Ind. 252, 64 N.E. 880 (1902) (quoting *Colson v. Thompson,* 2 Wheat. 336, 340, 4 L.Ed. 253 (1817)). Enforcement of a writing which is incomplete or ambiguous creates the substantial danger that the court will enforce something neither party intended. *See Cline v. Strong,* 52 Ind. App. 286, 100 N.E. 569 (1913).

1. When interpreting written contracts, courts seek to ascertain the intent of the parties at the time the contract was made as disclosed by the contract language. *First Fed. Sav. Bank v. Key Markets, Inc.,* 559 N.E.2d 600, 603 (Ind.1990).

Generally, "[w]hen a court finds a contract to be clear in its terms and the intention of the parties apparent, the court will require the parties to perform consistently with the bargain they made." *Id.* at 604.

Wolvos asserts that the option agreement is unduly indefinite and ought not be enforced because it is silent on various matters, including: the amount of earnest money; conditions precedent to the buyer's and seller's obligations to close; the type of financing; who would pay for the title insurance, surveys, inspections, real-estate taxes, and environmental remediation work in the event such cost exceeded $10,000; the nature and scope of warranties; the type of deed; the date of possession; and remedies for default. (R. at 44–46). Wolvos argues that by enforcing the option contract, the court would erroneously fill too many gaps which were left open by the parties. She cites the following language in *Workman v. Douglas,* 419 N.E.2d 1340 (Ind.Ct.App.1981), as support for this proposition:

> Closely allied to the matter of a contract too indefinite to enforce is the issue of the court's ordering the parties to enter into a contract. Recognizing the inadequacies of the flimsy agreement before it, the trial court succumbed to the temptation to do for the parties what they should have done in the first place. The trial Judge made them a new contract, similar in format to sale contracts recommended by the Indianapolis or Allen County Bar Association. The trial court stipulated terms never contemplated by the parties.

*Id.* at 1346. *Workman* bears no resemblance to this case. Workman made a down-payment and secured a mortgage on a house. Douglas lived in the house and paid Workman $96.80 per month, equivalent to Workman's monthly mortgage payment. Douglas asserted that the parties orally agreed that Douglas had contracted to purchase the home for installments of $96.80 per month for twenty-five years, and he sought the imposition of a resulting trust. Workman claimed that he merely rented the house to Douglas. The trial court found that Douglas orally contracted to purchase the property and ordered the parties to execute a written contract. The trial court ordered a particular type of form for the agreement, and

provided the interest rate and length of repayment, among other terms. The Court of Appeals reversed because, in part, the trial court imposed on the parties terms they never contemplated.

■■■ However, we note that only essential terms need be included in order to render a contract enforceable. "All that is required is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom." *Johnson v. Sprague,* 614 N.E.2d 585, 588 (Ind.Ct.App. 1993). In *Johnson,* our Court of Appeals noted that "all applicable law in force at the time the agreement is made impliedly forms a part of the agreement." *Id.* at 589. Absent an agreement to the contrary, there is a presumption that the buyer receives title by general warranty deed, and according to I.C. § 32–1–2–12, the buyer takes title free of any encumbrances. Thus, absent an express agreement to the contrary, the seller is responsible for any taxes and other obligations incurred prior to the date of sale. The *Johnson* court was able to find an enforceable contract for the sale of land where the agreement "correctly identified the parties, the real estate, the purchase price, and the closing date," and was signed by the party against whom enforcement is sought. *Id.* at 590.

In this case, the parties agreed to the essential terms. They also agreed to adopt the standard form used by brokers and realtors in St. Joseph County, which would establish other non-essential terms. As a licensed real-estate agent and broker, Wolvos presumably was aware of the standard forms used for the sale of property. While the option contract does not spell out in detail the particulars in such a standard form, it clearly establishes that a particular standard form is to be used.[2] *See Hazeltine Corp. v. Zenith Radio Corp.,* 100 F.2d 10 (7th Cir. 1938), *cert. denied,* 306 U.S. 656, 59 S.Ct. 646, 83 L.Ed. 1054 (1939) (holding that an option contract requiring Hazeltine to issue Zenith a license in a "standard form which is to be

2. Wolvos has not suggested that realtors and brokers in St. Joseph County typically use many different forms, each having different and significant effects on the rights and responsibilities of

the parties. Thus we have no reason to believe that the parties did not reach agreement upon all material and essential terms.

adopted" was adequately definite and enforceable). Thus, this is not a case of the trial court "ordering the parties to enter into a new and different contract" wholly uncontemplated by the parties; rather, this is a case of the trial court enforcing the parties' own agreement.

■ Few, if any, of the terms cited by Wolvos are essential to a real estate contract. Moreover, many of the terms that Wolvos claims are missing are in fact adequately provided for in the option agreement, including type of financing and responsibility for environmental remediation in excess of $10,-000. The option contract provides that financing will be either cash or conventional. Thus, the parties did negotiate and agree on what types of financing would be acceptable. Additionally, the option contract unambiguously gives Wolvos sole responsibility for environmental remediation, regardless of cost: "If [the environmental] study reveals the existence of contamination and/or pollutants to an extent that EPA, city, county or state standards and levels are violated and/or exceeded, then *Wolvos shall correct and remedy* such or any violations and excesses if optionee exercises option." The contract provides that the selling price may be reduced "[i]f the cost of such correction is less than $10,000." This provision in no way relieves Wolvos from her obligation to remediate the property if necessary, even if the cost of remediation would exceed $10,000. If costs remain which are not specified in such forms, as discussed in *Johnson,* 614 N.E.2d 585, the party responsible for the costs can be determined by whether the costs must be incurred before or after transfer of title, so that title can be conveyed free of all encumbrances.

Our Court of Appeals agreed that paragraphs one through seven of the agreement sufficiently identified the essential terms, including the parties, the subject real estate, the purchase price, and the time frame in which closing is to be completed. Thus, the Court of Appeals agreed that there is a sufficient basis on which to order specific performance. Op. at 675. The only point of divergence is whether the requirement to enter into a formal purchase agreement converted an otherwise enforceable contract into a mere agreement to agree.

Our view that this option agreement is a binding contract which merely requires the execution of a more formal contract accords with Indiana case law. For example, *Navin v. New Colonial Hotel, Inc.,* 228 Ind. 128, 90 N.E.2d 128 (1950), involved an offer for sale of property which provided details including price, description of the property, interest, and which specified use of an Indianapolis Real Estate Board contract deed. The property owner accepted the offer in writing. The assignee of the buyer then tendered the agreed-upon amount, and demanded execution of a conditional sales contract. The seller refused the tender and refused to execute the contract. *Id.* at 132, 90 N.E.2d 128. We observed that the offer as accepted

> constituted a binding contract in praesenti notwithstanding it contemplated another more formal document. By this contract Fuller bound himself to sign and execute the final draft of the contract upon the approved form of the Real Estate Board; this remained to be done.... Such final draft, when executed, would have merged into the original offer and acceptance.

*Id.* at 133, 90 N.E.2d 128. An agreement to execute an approved form of a local real estate board is similar to an agreement providing for execution of a form typically used by local real estate agents and brokers upon exercise of an option. Just as we would have held the buyer obligated on the contract in *Navin,* in this case we hold the seller obligated on this contract.

Similarly in *Wallace,* 86 Ind.App. 185, 156 N.E. 562, our Court of Appeals reversed a judgment for the defendants, rejecting the defendants' argument that the agreement was only a "conditional proposal" or "preliminary negotiation looking to the possible execution of a lease, and that no one was bound by it." *Id.* at 190, 156 N.E. 562. The Court of Appeals held that an agreement providing that "the lease should be formally drafted and contain the usual stipulations concerning the rights and remedies of the parties" was not simply an "agreement to further negotiate, but to make a formal lease." *Id.* at 191, 156 N.E. 562. While the provision was not

without ambiguity, the Court of Appeals observed that its meaning could be "reduced by evidence to definite terms." *Id.* at 192, 156 N.E. 562. Likewise, in this case, paragraph eight is not unduly indefinite nor does it convert the option contract into a mere agreement to agree.

We are further persuaded by an analogous case, *Ray v. Wooster*, 270 S.W.2d 743 (Mo. 1954). The *Ray* court held adequately definite and enforceable a contract for both real and personal property that did not specify whether the conveyance was to be by warranty deed or quitclaim deed. *Id.* at 751. Additionally, the contract did not specify, among other things:

> whether an abstract of title was to be furnished, and who should pay for same; ... who should bear the expense of perfecting the title should same be found defective; [ ] adjustments with reference to taxes and insurance, and the dates thereof; [ ] under what conditions would defendants be entitled to forfeiture of the earnest money; ... transfer of the registration of the cows in question; ... [and] who should assume the risk of loss....

*Id.* at 751. The Missouri court held:

> The universal rule is that a contract to be specifically enforceable must be complete in its essential and material terms, and capable of being enforced without adding to its terms. A corollary to this rule is that where the contract does contain the essential elements it is not incomplete or indefinite because it fails to express in terms some matters concerning the performance of the contract which are usually found in such instruments and calculated to facilitate the attainment of its object, or does not include other nonessential provisions which might properly have been incorporated in the agreement. Such matters may be left open for future specification without destruction of the contract or depriving a party remedy for its enforcement.... The essential terms of a contract of the character sought to be enforced in this action are: (1) the parties; (2) the subject matter; (3) the

promises upon both sides; (4) the price; and (5) the consideration.

*Id.* at 751–52.

Thus, we hold that the parties intended to be bound upon execution of the option contract. The contract is adequately definite since it contains all essential terms and provides for use of a standard agreement to govern the non-essential details. This is no mere agreement to agree, but a binding contract that the trial court properly enforced by granting Meyer partial summary judgment. Wolvos must now enter into a standard purchase agreement with Meyer, as provided for in their option agreement.

## II

Wolvos argues that the trial court erred in denying her T.R. 60(B)(3) motion for relief from judgment. T.R. 60(B) provides in relevant part:

> On motion and upon such terms as are just the court may relieve a party or his legal representative from an entry of default, final order, or final judgment, including a judgment by default, for the following reasons:
>
> ...
>
> (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party....

Whether to grant or deny a T.R. 60(B) motion for relief from judgment is within the sound, equitable discretion of the trial court. We will not reverse a denial of a motion for relief from judgment in the absence of an abuse of discretion. *See Shotwell v. Cliff Hagan Ribeye Franchise, Inc.*, 572 N.E.2d 487 (Ind.1991). Wolvos alleges misconduct stemming from Meyer's failure to disclose his legal training to her prior to the transaction. She argues that if Meyer had disclosed that he had graduated from law school, she would have sought legal counsel to review the option agreement. She asserts that because Meyer is a lawyer who allegedly withheld this fact from her and allegedly advised her not to seek legal counsel in entering into the option contract, Meyer should

not be granted the equitable remedy of specific performance.

Wolvos cites two cases to support her argument, but both are clearly distinguishable. In each case, the party seeking an equitable remedy violated rules which bound him. In *Halliday v. Auburn Mobile Homes,* 511 N.E.2d 1086 (Ind.Ct.App.1987), Halliday sought to prevent his ejectment from a mobile home park. However, because he had deliberately violated rules of the park, this equitable remedy was not available to him. Similarly, in *Briggs v. Clinton County Bank and Trust Co.,* 452 N.E.2d 989 (Ind.Ct.App. 1983), Briggs was denied relief in quantum meruit due to undue influence exerted within the scope of an attorney-client relationship.

Likewise, Wolvos argues that Meyer violated IND.PROFESSIONAL CONDUCT RULE 4.3, and that this violation prohibits Meyer from seeking an equitable remedy. This rule and its comment provide that a lawyer should not give advice to an unrepresented person other than the advice to obtain counsel. However, Meyer has not been admitted to the Indiana bar, nor has he been admitted to the bar of any state. Thus, unlike Halliday and Briggs, Meyer was not required to conform his behavior to a specific set of rules.[3] Additionally, the record does not clearly establish that Meyer's behavior would have violated PROF. COND.R. 4.3. Wolvos claims that Meyer advised her not to seek legal advice. Meyer, on the other hand, recalled that he encouraged Wolvos to seek legal advice, but she indicated that she felt confident that she could handle the transaction herself. (R. at 72). Thus, even if Meyer had been bound by PROF. COND.R. 4.3, we likely would not find that the trial court abused its discretion by denying relief.

Furthermore, Wolvos fails to identify anything in the record that suggests that the transaction was not at arms length. As such, she was on notice and should have known that legal counsel might be helpful in protecting her interests. We note that Wolvos is a licensed real estate agent and broker, and has been so since 1974. (R. at 70). Moreover, because Wolvos found out about Meyer's legal education only *after* executing the option contract, she did not rely upon his statements based upon his status as a lawyer. Instead, Wolvos, a real estate broker, allowed a potential buyer to draft the agreement. Wolvos freely exercised her right to enter into a contract, yet she now asks us to relieve her of an obligation flowing from that contract. We will not.

Based upon the facts in their totality, we hold that the trial court did not abuse its discretion in denying Wolvos' motion for relief from judgment.

### CONCLUSION

The trial court's grant of partial summary judgment is affirmed, as is the trial court's denial of Wolvos' T.R. 60(B)(3) motion for relief from judgment.

SHEPARD, C.J., and DeBRULER, DICKSON and SULLIVAN, JJ., concur.

---

**3.** We express no opinion as to what our holding would have been had Meyer's conduct been presented to us in the context of a disciplinary action.