In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1083 & 00-1138

WILLIAM MAYS, LOUIS BUDDY YOSHA,
Trustee of the charitable remainder unitrust,
CYNTHIA ANN YOSHA SNYDER, Trustee
of the irrevocable trust agreement, et al.,

Plaintiffs-Appellants/
Cross-Appellees,

v.

TRUMP INDIANA, INCORPORATED,

Defendant-Appellee/
Cross-Appellant,

and

Donald J. Trump,

Defendant-Appellee.

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 96 C 425--Richard L. Young, Judge.

Argued September 29, 2000--Decided June 18, 2001

Before EASTERBROOK, RIPPLE, and EVANS,
Circuit Judges.

EVANS, Circuit Judge.  It was extremely controversial, and it passed over the veto of then-Governor Evan Bayh, but Indiana enacted legislation in 1993 permitting, for the first time, riverboat gambling in several Hoosier counties contiguous to Lake Michigan, the Ohio River, and Patoka Lake. Two of several possible gambling licenses were earmarked for Gary, a troubled city in the shadow of a megatropolis--Chicago.

Promoters of gambling argued that it would bring loads of cash into communities like Gary and spark an economic renaissance. This was welcome news for a smokestack-shrouded, rust-belt city like Gary, a city devastated by the loss of thousands of steel industry jobs and left with block after block of decaying houses and empty storefronts.

Things had gotten so bad in Gary that in 1993, when the gambling measure passed, its homicide rate (91 slayings per 100,000 residents) left it with the nasty moniker of "Murder Capitol" of the United States.

This case is a saga about the gambling-license-snaring process and its fallout. The cast of characters includes two folks from Indianapolis: William Mays and Louis Buddy Yosha. Mays is a successful businessman, the owner (with his wife) of the Mays Chemical Company and two radio stations (KISS 106.7 and WIRED 100.9 FM), an investor in many other enterprises, a philanthropist, and a multimillionaire. Yosha is a very successful plaintiff's personal injury attorney. In the other corner is Donald Trump, known to some as The Donald and to others as the former husband of Ivana. Trump's activities here were through several of his companies, particularly a new one called Trump Indiana, but we'll refer to all of them simply as "Trump" (and we'll use "he" and "it" interchangeably) as we slug our way through this opinion.

In a nutshell, Mays and Yosha (and several trusts Yosha created for the benefit of his children, another detail we can ignore) claim Trump breached a contract (1) to make them minority (1 percent each) partners in his Indianagambling enterprise and (2) to create a foundation--with the two of them on its board of directors and little control from Trump--to benefit various charitable causes in Indiana. A jury found for Mays and Yosha and awarded them $1.4 million in damages. After a court trial, the district judge denied Mays and Yosha's request for specific performance, finding that a different charitable organization--the Trump Indiana Foundation--was an acceptable novation-inspired substitute for what Mays and Yosha wanted. The judge did, however, order that Mays and Yosha get seats on the board of the new foundation. Mays and Yosha appeal on the specific performance question and Trump cross-appeals, saying no contract was ever formed and Mays and Yosha are entitled to nothing.

To best understand this case, and to support why we resolve it as we do, a lengthy review of the facts, sprinkled with several observations as we go along,

is necessary.

   Normally, when someone wants to start a business, one simply starts it. But everything's different in a regulated industry, and it's even more different in a super-regulated, explosively charged business like legal gambling. There's a lot of politics involved in this sort of undertaking and a lot of minefields to traverse before the prize--a license toengage in legal gambling--is won. And under the 1993 law, the Indiana Gaming Commission decided who would win that prize.

   The two Gary licenses were to be issued first, and applicants were required "to provide assurances that economic development will occur in [Gary] and that adequate infrastructure and site preparation will be provided to theriverboat operation." Ind. Code sec. 4-33-6-7(b). Consequently, Gary applicants had to build an "approved hotel" or "cause economic development that [would] have an economic impact on the city [exceeding] the economic impact that the construction of an approved hotel would have." Ind. Code sec. 4-33-6-7(b).

   This was a State of Indiana operation, yet the City of Gary was, quite understandably, very interested in thelicense-awarding process. It wanted a voice, and one can easily understand why. So Gary requested proposals from potential applicants even before they made contact with the state commission. Gary's request outlined several demands to be met before the city would endorse (though its endorsement wasn't legally required) an application to the commission. One of Gary's requirements was that an applicant have 15 percent local ownership.

   Most people can smell money when they hear the phrase "riverboat gambling." That was especially true when it was "riverboat gambling" within sight of a place like Chicago. Trump--and Mays and Yosha, for that matter--had nothing wrong with their noses. They could sniff the smell of money. Trump, as most everyone knows (judicial notice is usually confined to undisputable facts like Greenwich mean time, but we feel safe here), controls an empire that includes a

gambling casino in Atlantic City, New Jersey. Mays was active in politics and a member of the Indiana State Lottery Commission. He testified during the trial that "gaming was a really profitable activity" and a "printing press for money." As things were playing out, it looked like the road to that money ran through Gary, and Trump--along with his competitors--took steps to secure a favorable nod from the city.

As the process unfolded it became apparent that, as far as Gary was concerned, there were four horses in this race but only two would finish in the winner's circle. Trump was one of the four, and it was trying hard to enhance its standing with the city as 1993 came to a close.

Fifteen percent local ownership in the riverboat casino came to be seen as a nonnegotiable demand for winning Gary's endorsement. Trump did not need nor want local investment, yet it gave in. According to a Trump executive:

It [15% local ownership] was not something that we wanted to do. As indicated on that first line in the first page [of Exhibit 200, a December 30, 1993, letter to Trump from the Gary mayor's office], we were at this time negotiating with the City to get their endorsement of [Trump Indiana's] application when we did go before the Gaming Commission. And the City had indicated that they were not under any circumstance going to give us that endorsement absent our agreement to do this. So we did agree to make 15% of the equity available to Gary residents essentially in exchange for the City's endorsement.

The city memorialized its understanding of Trump's commitment (the same December 30, 1993, letter just mentioned) to be: (1) spending at least $153.35 million on the riverboat and accompanying facilities; (2) creating 1,675 new permanent jobs; (3) filling 67 percent of those jobs with Gary residents and 90 percent with Lake County residents; (4) using best efforts to maintain 70 percent racial minority and 52% female employment; and (5) making at least 15 percent of the equity in the company available to Gary residents. If Trump was

selected by the state gaming commission, a binding development agreement was required to memorialize these commitments. Trump was not alone here, as all other applicants for licenses made similar commitments to the city. Competition for Gary's endorsement, and a license from the state, was obviously fierce.

Trump then turned his attention to identifying local investors before February 14, 1994, the date another step in the application process was due before the state commission. But bad news arrived when Trump learned Gary would not endorse its application, but would instead endorse two other applicants. Undaunted, Trump continued its efforts to identify local investors because it believed a third license might be awarded to Gary, and if the commission gave it to Trump, a development agreement with the city, which would require local ownership, would still be necessary. As a Trump executive put it, "We wanted to be sure that on a going-forward basis if we were fortunate enough to be awarded the license that our relationship with the City of Gary was on very amicable terms."

By early 1994, seven individuals from the Gary area and two from Indianapolis-- Mays and Yosha--were tapped to be Trump's "local investors." The entree to Mays was through a Trump attorney (Greg Hahn), Mays' friend since the days when both were living and apparently going to school in Evansville, Indiana. Mays (and Yosha, for that matter) had no connection with Gary, but because this was still a State of Indiana license, it was thought that someone of statewide prominence would gussy up Trump's application.

At this point it is helpful to step back and view the lawsuit claims of these parties. Mays and Yosha claim they entered into a binding contract with Trump and that they held up their part of the bargain, while Trump did nothing he was contractually obligated to do. Mays and Yosha find "the contract" by cobbling together several documents, notably letters of February 26, 1994 (trial exhibit 5), April 6, 1994 (trial exhibit 10), and September 16, 1994 (trial exhibit 35)./1 Trump says no binding deal was reached:  there were negotiations, there were ideas, there were proposals, and there were plans, but

there was no finished contract upon which Mays and Yosha could seek damages or specific performance in court. While the jury, in a simple general verdict, found for Mays and Yosha on their claim that a contract was breached, whether as a matter of law (Indiana law applies) a contract was formed is a different question, one committed to a judge or, at this stage of the case, a panel of judges.

Back to the facts. Mays and Yosha (and the seven folks-- later reduced to six-- from Gary, including a doctor, an optometrist, a steel worker, a union president, and a school administrator) were listed as "proposed local minority participants" on Trump's license application filed with the state gaming commission. The February 26 letter (we'll have something to add from this letter in the penultimate paragraph of our opinion), sent to Mays and Yosha by Trump's attorneys, said "nine (9) investors . . . will own, collectively, 7.5 percent of the project being developed in Gary." The letter also stated that "7.5 percent will be owned by a trust, which will make contributions to charitable organizations throughout the Gary area."

On April 6, 1994, Trump attorney Hahn sent letters to Mays and Yosha which included the following statements regarding the terms of the proposed deal:

The investors will be holders of Class "B" stock which "will not have the full voting privileges of Class 'A' stock but will have the same per share economic rights with respect to dividends."

The Class "B" stock will be owned equally by a charitable trust (7.5%) and the identified group of eight (8) individual investors (7.5%), of which you are one.

Trump has agreed to "loan" each investor an amount equal to their investment. By executing the non-recourse promissory note, you, as an investor, agree to pay Trump the principal sum of $1,434,750.00.

[T]he principal amount is to be paid solely from cash distributions or dividends declared by Trump Hotels &

Casino Resorts, Inc.

Trump will have the first right of refusal to purchase your stock if you decide to sell said stock in the future.

The finality of these terms is qualified in the letter by the following statements:

[I]t is reasonable to assume that the accompanying financial information will also be fluctuating as the proposal is revamped.

Presently, it is anticipated that 85% of the total number of stock issued will be Class "A" and theremaining 15% will be Class "B."

Again, the total development cost figure ($153 million) and the ultimate amount that your investment represents is subject to change.

We have not completed all the terms of this transaction. We hope to have all the documents finished for your review within the next 2-3 weeks.

On May 24, 1994, Hahn wrote Mays and Yosha regarding the charitable foundation project mentioned in the April 6 letter:

In order to give the [Indiana Gaming] commission an idea of what we are striving for, we would like to go ahead and designate ten local charities as part of the foundation. In that vein, please give us an indication as to whether or not you would be willing to serve on the foundation, and a list of charities you believe should be included.

. . . .

We will be contacting you on or about June 1, 1994, with the date and times of the investment meetings to be held in Gary and we would appreciate having received your input with respect to the charitable organizations and/or your willingness to serve on the foundation by that time.

Enclosed with the letter was a copy of a document entitled "The Trump-Indiana Charitable Foundation," identifying Trump Marina Resorts, Inc. d/b/a Trump Princess

Indiana, Inc. as the "Donor" but with an open space for the names of the "Trustees."

In August and September 1994, the Indiana Gaming Commission conducted hearings regarding the license selection process. At those hearings, commissioners raised questions about Trump's application centering on the "local investors." In answer to a question from one of the commissioners (Sundwick), a Trump representative explained:

A: Can I address one part of your question with respect to why we did this because I was the decision-maker. It was strongly suggested during the approval process. This was one of the major criteria in determining the acceptability of a proposal from the City of Gary, that local participation was mandatory and that was what was carried back to me by our representatives. If you're asking me, Does this make economic sense? Does it make business sense? Absolutely not. I have to finance this project. I have to put in real dollars and real equity.

. . . .

But as for investors, in all candor, there is no economic basis to do that. It became part of the process.

Q: It wasn't the policy that was actually just required.

A: No, no, it certainly wasn't. Mr. Trump and I discussed it in some great deal because we had a lot of problems understanding why and on what basis we would do something like this.

Another commissioner, Bochnowski, then commented:

I mean the intent is to have local involvement. This is not local involvement. This is like buying names so that you can look like you have local involvement, and you're no different than anybody else in this regard, and that's why we have these so-called local investors from Indianapolis. Hopefully this experience will not be carried out in other states.

During the hearing process, in answer to a commission letter asking for responses

to six questions, Hahn (with another member of his law firm) sent a letter to the gaming commission on September 16. This letter, which we noted earlier is relied on (along with the letters of February 26 and April 6) by Mays and Yosha to prove the existence of their contractual rights, listed the eight investors, their net worth, and a range of details about the investors' involvement and the structure and workings of the proposed charitable foundation.

We are now at the critical point in time in the case. Trump says he decided that the whole "local investors" thing was not helping the quest for a license, so he jettisoned the idea and proceeded on a different track. This move, says Mays and Yosha, was a breach of contract for which they are entitled to damages representing the value of the equity interest in the casino that did not come their way plus the establishment of a foundation over which they would exercise substantial power.

After the Trump/Mays-Yosha divorce, Trump moved stock around several of his companies and eventually offered new stock in a public sale. This was happening at a time of uncertainty because Trump did not yet have a license to operate the casino. In addition, there were concerns about whether operating a riverboat casino on Lake Michigan would be permissible under federal law. And Trump also was fighting a rearguard action against Mays and Yosha who tried to convince the gaming commission that Trump should not get a license for several reasons, including his breach of contract with them and his involvement in inappropriate financing and public stock offerings. Ultimately, the commission issued a license, the project went forward, and Trump established a different charitable foundation that was acceptable to the City of Gary.

The pivotal issue is whether the alleged contractual agreement Mays and Yosha say they had with Trump was sufficiently certain to create the two enforceable obligations they seek to establish. The first obligation would require Trump to cut Mays and Yosha in on the final deal to the extent of a 1 percent ownership (a .9375 percent share, to be exact)

interest for each. The second obligation would be to create a charitable foundation exactly as described in the letters of February 26, April 6, and September 16 of 1994.

   Before the trial of this case, both sides moved for summary judgment, arguing that the facts were not in dispute and that a contract existed (Mays and Yosha) or didn't exist (Trump), as a matter of law. The motions were denied. After Mays and Yosha presented their case, and again before the jury spoke, Trump moved for judgment in his favor as a matter of law. Both motions were denied. For the reasons we are about to note, we think no binding contractual agreement was reached.

   Under Indiana law, and in fact the law of every jurisdiction, a meeting of the minds on all essential terms must exist in order to form a binding contract. See Eastern Natural Gas Corp. v. Aluminum Co. of America, 126 F.3d 996, 1002 (7th Cir. 1997) (applying Indiana law). And a mere agreement to agree does not a binding contract make. As the Indiana Supreme Court observed in Wolvos v. Meyer, 668 N.E.2d 671 (Ind. 1996),

[i]t is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called "contract to contract" is not a contract at all.

Id. at 674-75 (quoting Corbin on Contracts sec. 2.8, p. 131 (rev. ed. 1993). The Wolvos court clarified this statement by noting, "The question of whether an agreement is an enforceable . . . contract or merely an agreement to agree involves two interrelated areas: 'intent to be bound and definiteness of terms.'" Id. at 675. Without an express statement of intent, the focus is on whether the contract is too indefinite to enforce. Thus, the existence or nonexistence of a

contract turns on whether material terms are missing. And here, material terms are absent in spades.

Mays and Yosha, unlike the six Gary "local investors," (who, by the way, settled their disputes with Trump before trial) were savvy in the ways of business deals and law. While we have no reason to doubt that both were interested in the proposed charitable aspects of the arrangement, the fact remains that this was a financial deal for them that was almost too good to be true. For essentially doing little more than adding their names to the Trump license application--which would demonstrate that the Trump team was "Hoosierized"--they were to receive a financial windfall. They would get a million or so dollars with no risk because, for most of the time, the proposed "loan" to them for the purchase price of their "investment" was without recourse and the "loan" was to be repaid with Trump's money. Anyone in his right mind would jump at the chance to get on a gravy train like this.

As a general proposition, common sense dictates that as an agreement becomes more complex, the need for clarity and formality increases. An agreement to sell a sofa at a rummage sale requires a lot less than an agreement to sell a house. And this was a very complex, multimillion-dollar venture. Early in the process, Trump thought adding "locals" like Mays and Yosha to his team would have value when the city and/or the state gaming commission considered his license application. But the details of how they were to participate, although sketched in broad outline, were never cemented. Would the Mays/Yosha "notes" be recourse or nonrecourse? What if any interest rate would attach to the "loan"? Neither Mays nor Yosha ever saw a finalized promissory note. What was the duration of the loan? What were its terms of repayment? Would security for the loan (if it was recourse) be required? And a particularly key element in the deal--also undefined--was Trump's right to repurchase the proposed investors' stock. If that right was exercised, how would the price and terms of repurchase be established? None of these details, it seems, were even discussed, much less finalized. In short, what we have here is best characterized as an agreement to agree, and that is

unenforceable under Indiana law. Wolvos, at 674-75.

   Further support for finding that essential terms were still to be nailed down can be found, ironically, in two of the three letters Mays and Yosha point to as evidence of the existence of a finished contract. The February 26 letter, while opening with a confusing statement that (Mays or Yosha) is "an investor in the Trump application" (whatever that means), concludes with this statement:  "Our office looks forward to working with you and we will be communicating with you in the next few days to arrange a meeting wherein you can meet with us . . . to discuss, in further detail, the Gary project and your specific participation." The letter of April 6, while noting the Trump right-of-first refusal if an investor decides to sell the stock, says, "We have not completed all the terms of this transaction. We hope to have all the documents finished for your review within the next 2-3 weeks." These statements demonstrate that further clarifications and modifications on material points were anticipated.

   In their suit, Mays and Yosha were essentially seeking millions for almost nothing because for a time they thought they were going to get exactly that, millions for almost nothing. For lending their names to the Trump team during the license application process, but without actually investing any money or putting any of their assets at risk, Mays and Yosha hoped to hit a jackpot once the casino boat was launched. The desire to put one's self in that position is completely understandable. But this complicated deal was never reduced to the kind of solid contract that could be comfortably enforced in a court of law. The judgment of the district court is REVERSED and the case REMANDED to the district court for the entry of judgment in favor of the defendants.

FOOTNOTES

/1 These letters, by the way, were sent by Trump's local counsel in Indiana, Don Tabbert (February 26), Mr. Hahn (April 6), and Tabbert and Hahn (September 16). Although their authority to generally act for Trump is unquestioned, their actual authority to bind him to specific contrac-

tual provisions is less than clear. In fact, Trump testified (by deposition) at the trial that his ground troops in Indiana were his regular people, Nicolas Ribis and Robert Pickus. He said, in fact, that he would sue Hahn and Tabbert "if they did anything other than" what he instructed them to do, which was not get tangled up with "local investors."