**UFG, LLC, David Henigan, the Estate of LaVern C. Schramer, and LaVern C. Schramer, Jr., Appellants,**

v.

**SOUTHWEST CORPORATION, Appellee.**

No. 71A03–0205–CV–162.

Court of Appeals of Indiana.

March 7, 2003.

David B. Weisman, Weisman Associates, P.C., Mishawaka, IN, Michael T. Franz, Freeborn & Peters, Chicago, IL, Attorneys for Appellants.

Timothy J. Maher, D. Michael Anderson, Barnes & Thornburg, South Bend, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

UFG, LLC, David Henigan ("Henigan"), the Estate of LaVern C. Schramer Sr. ("Schramer Sr.")[1], and LaVern Schramer

1. LaVern Schramer Sr. died prior to the initiation of this suit.

Jr. ("Schramer Jr.") (collectively "the appellants") appeal the trial court's judgment against them on complaint seeking specific performance in the conveyance of a condominium complex from Southwest Corporation ("Southwest") and damages.

We reverse in part, affirm in part, and remand.

### ISSUES

1. Whether there was a contract for the sale of land.
2. Whether the trial court erred in ordering removed the appellants' lis pendens notice.

### FACTS

Donald Fisher is the sole shareholder and owner of Southwest, an Indiana corporation that owns and operates four multiunit residential buildings in South Bend, Indiana, known as the College Park Horizontal Regime ("College Park"). On October 2, 1998, Henigan and the Schramers met with Fisher to discuss the sale of College Park. On January 26, 1999, the same parties participated in a telephone conference call during which they discussed the "terms and conditions of the sale, . . . ." (Tr. 70).

Subsequently, in a letter dated February 1, 1999, Fisher outlined what he believed to be the terms of the proposed sale of College Park. Fisher wrote that two of the buildings (Phase I) would be sold for a total price of $1,275,000; five thousand dollars would be due at the time the parties signed the "sell/buy agreement" and a $250,000 down payment would be due at closing. Specifically, Fisher wrote that Phase I was to be financed through a fifteen-year mortgage at a rate of eight percent interest to Southwest. Fisher also mentioned that Henigan and the Schramers would be granted an option to buy the remaining two buildings (Phase II) for an additional $1,530,000, and that they would be responsible for paying a portion of the current property tax due; all current leases were to be assigned to Henigan and the Schramers. Fisher then asked the parties to review the letter and to add anything that might have been omitted. Fisher concluded, "I will then, at my expense, have an attorney prepare a sell/buy agreement for you and your advisor(s) to review, at your expense." (Pl. Ex. 5).

On February 2, 1999, Henigan faxed a letter to Fisher agreeing to certain proposals and offering alternatives to others. Specifically, Henigan stated that Fisher would have to pay for all property taxes "up to the closing dates, or the unpaid taxes" could be credited toward the purchase price. (Pl. Ex. 6). Henigan also asked Fisher to fax him a list of the existing leases, the rental rates, and the number of people in each unit for services. Fisher was asked for his thoughts on "these items . . . ." *Id.*

After speaking to Fisher on February 11, 1999, Henigan sent Fisher another letter explaining that he and the Schramers could not proceed with the sale of College Park if they had to pay the unpaid balance of property taxes. Henigan asked Fisher to consider (1) paying the property taxes "up to the time" they took possession; (2) "[l]owering the interest rate on financing from 8% to 7% as originally discussed"; or (3) lowering the purchase price for College Park. (Pl. Ex. 7).

On February 26, 1999, the parties participated in another telephone conference. After the conference call, Henigan faxed the following self-styled "acceptance letter" to Fisher:

**DATE:** February 26, 1999

**TO:** Mr. Donald Fisher

**FROM:** David Henigan, Thomas Kenny, LaVern Schramer, and LaVern

Schramer Jr. (Organizational name to be determined at a later date).

**SUBJECT:** College Park Horizontal Regime

**PURPOSE:** Acceptance letter in accordance with our discussions of 2/26/99

**Property to be purchased:** The property contemplated for purchase here in [sic] would be completed in two (2) phases. **The purchase of Buildings 2 and 3 in Phase I:** The phase I purchase is contemplated to close on or before May 31, 1999. Phase I would include the purchase of the 20 units enclosed within buildings 2 and 3.

**The purchase of Buildings 4 and 5 in Phase II:** The Phase II purchase is contemplated to close on or before May 31, 2000. Phase II would include the purchase of the 24 units enclosed within buildings 4 and 5.

**Purchase Price Phase I:** $62,500.00 per lower unit and $65,000.00 per upper unit. Total purchase for all 20 units will be $1,275,000.00.

**Purchase Price Phase II:** $62,500.00 per lower unit and $65,000.00 per upper unit. Total purchase price for all 24 units will be $1,530,000.00.

**Down Payment Phase I:** $250,000.00.

**Financing Provided by Southwest:** Southwest will provide financing for the balance of the property price of Phase I at a not to be adjusted annual interest rate of 7%.

**Terms of Phase I financing:** The terms of financing for Phase I shall provide for a payment of principle and interest, paid monthly, based on a 15–year amortization schedule with a balloon payment equal to the unpaid principle

balance of the contract property price at the end of three (3) years.

**Terms of Phase II financing:** No financing required, Cash purchase.

**Phase I Earnest Money:** Not required.

**Phase I Option Contract Price:** No cost.

**Phase II Option Contract Price:** The cost of the option contract for Phase II shall be $10.00.

**Notes:** (1) Southwest will continue to pay Association Fees until Buyer takes possession of the property. (2) The cost of preparing the Option Contracts will be split evenly between Buyer and Seller. (3) Buyer will honor all current leases. (4) All property taxes assessed against and incurred by Seller on the property, up to the time of possession by Buyer, will be the responsibility of Seller. Seller will reimburse such tax amounts to Buyer at time of closing. (5) All appropriate advanced rental and deposit payments will be transferred to Buyer. This will include Security deposits on existing leases where Buyer will have to refund deposits or repair property damage caused by existing tenants.

Upon Southwest's agreement of these terms and conditions, please sign where indicated and fax to 630–761–3946. Please mail the signed original to David Henigan at 326 Meadowrue Lane, Batavia, IL 60510. Upon acceptance, we will formalize the option and purchase contracts.[2]

Acceptance:

Date: 3–10–99

Signature of authorized person:

_____

Donald B. Fisher

---

**2.** The word 'formalize' is defined as acting "with formality; to be formal or ceremonious; to show the spirit of a formalist." Ox-

FORD ENGLISH DICTIONARY at *http://www.dictionary.oed.com/cgi/entry/00088529.*

Title:

_____

President

(Pl. Ex. 4). On March 10, 1999, Fisher signed and returned the letter to Henigan without making any changes to it. After receiving the "acceptance letter", Henigan responded by thanking Fisher for his acceptance and asked that Fisher not make any changes to "any of the terms and conditions" in the "acceptance letter." (Pl. Ex. 9). In addition, Henigan wrote that he and the Schramers "would like to have the contract from [Fisher's] attorney no later than April 30, 1999 so [they could] have sufficient time to" review it before the closing scheduled for May 29, 1999. (Pl. Ex. 9).

█ In April 1999, Henigan received a title commitment showing unpaid property taxes and a judgment of $8,960.88 against College Park. In addition, on May 6, 1999, Henigan received a draft of the final contract from Fisher. However, the draft framed the sale "as a conditional land contract, rather than the agreed upon mortgage contract."[3] (Tr. 102). While Henigan also received an undated copy of a corporate resolution from Southwest granting Fisher authority to sell College Park, he did not receive an updated closing statement or legal description of both the buildings and the land prior to the closing scheduled for May 29, 1999. Further, certain roof and appliance repairs within College Park had not been completed. As a result, the closing did not occur.

On June 1, 1999, Edward Hardig ("Hardig"), Fisher's attorney, faxed a closing statement, "all computed as of 11:59 p.m. 5/31/99," stating that it was his under-

standing that "the closing was to take place" that day in his South Bend office at 1:15 p.m. (Def. Ex. J). On June 7, 1999, Solomon L. Lowenstein ("Lowenstein"), another attorney representing Fisher, faxed a letter to Henigan asking "whether or not closing on the College Park Condos [would] take place this week." (Def. Ex. L). On June 9, 1999, Lowenstein faxed another letter to Henigan. Lowenstein wrote that all repairs were either complete or in progress; proposed that a final inspection occur on June 10, 1999; that Fisher was willing to place $5,000 in escrow for minor repairs; and that the closing was set for June 11, 1999. In addition, Lowenstein noted that if the closing did not take place, "then [the] deal [would be] off." (Def. Ex. M). On June 10, 1999, Lowenstein wrote that the closing date would not be rescheduled, and that Fisher would require "certified funds to close this transaction." (Def. Ex. N). However, the closing did not take place.

Subsequently, the parties scheduled another closing for July 9, 1999. Prior to this date, Fisher obtained another title commitment, effective July 7, 1999, showing that the judgment against College Park had been released and the property taxes had been paid concurrent to May 1999. As a result, Schramer Sr. obtained a cashier's check from Old Second National Bank in the amount of $250,000, representing the down payment for Phase I. However, neither Henigan nor the Schramers had received a completed final contract, an updated closing statement, or appropriate legal description of College Park before their arrival for closing on July 9, 1999, at Fisher's College Park of-

3. "Under a typical conditional land contract, the vendor retains legal title until the total contract price is paid by the vendee. Payments are generally made in periodic installments. Legal title does not vest in the vendee until the contract terms are satisfied, but equitable title vests in the vendee at the time the contract is consummated." _Skendzel v. Marshall_, 301 N.E.2d 641, 646, 261 Ind. 226, 234 (Ind.1973).

fice. When Henigan and the Schramers arrived at Fisher's office on July 9, 1999, they showed Fisher the certified check for purposes of closing but became upset "because documentation wasn't complete" and they still objected to Fisher changing the sale to a land contract, rather than a mortgage.[4] (Tr. 119). Fisher then asked them to draft the final contract documents; Henigan and the Schramers agreed and left hoping that the closing would take place in October 1999.

At some point between July and September, Henigan and the Schramers presented a finalized contract to Fisher and told him they would like to close on October 8, 1999. However, Fisher then sent Henigan and the Schramers another draft of a contract adding a host of new provisions limiting the buyer's use of the equity in the property, default, and requiring personal guarantees from the buyers. On September 13, 1999, Hardig faxed a letter and a form to terminate the purchase agreement to Henigan's attorney, Stanley F. Collesano ("Collesano"). In that letter, Hardig requested that Henigan and the Schramers sign the termination agreement because it appeared that Henigan and the

Schramers did not wish to close the purchase of College Park. On September 23, 1999, Collesano faxed a reply to Hardig noting that Henigan and the Schramers intended to close on October 1, 1999, but that "there were a number of corrections that need[ed] to be made to the documentation" that had been previously provided by Fisher.[5] (Pl. Ex. 21). However, the parties failed to close the transaction in October.

Henigan testified that on December 14, 1999, Fisher telephoned him and again requested that he and the Schramers make some more changes to the terms of the contract.[6] The same day, Henigan sent Fisher a letter informing him that they would bring legal action against him if he did not comply with the terms of the "acceptance letter." (App. Vol. III Tab. 17).

On April 14, 2000, the appellants filed a complaint seeking specific performance, damages, and a notice of lis pendens. The appellants alleged that Fisher breached the contract to sell College Park by refusing to sell the property in accordance with the terms of the "acceptance letter." A

---

4. The record also indicates that on July 8, 1999, Hardig sent Collesano, Henigan's attorney, an updated draft of a closing statement. Later that evening, Hardig received a telephone message from Collesano stating the closing would not proceed because there are "too many issues that need to be worked out...." (Def. Ex. BB). Hardig testified that on July 9, 1999, Henigan and the Schramers failed to show up at his office, and that he had prepared drafts of secured "promissory notes and real estate mortgage and assignment of leases." (Tr. 240).

5. With regard to the mortgage and assignment of leases, Collesano wrote that UFG would not agree to (1) any limitation on UFG's use of the equity in the property; (2) any provision giving Fisher "full control over any [proceeds] that [might] result from [any

future] eminent domain [proceedings], other than applying it towards the outstanding balance" of the mortgage; (3) the use of assets to pay the mortgage that might be placed in escrow to pay for "taxes, assessments, liens and charges" in the event UFG defaulted; (4) any provision requiring UFG or its members to provide Fisher with corporate and personal financial statements other than rents received from College Park; (5) any provision requiring UFG to pay for Fisher's costs in pursuing foreclosure; (6) any provision allowing Fisher to pursue foreclosure in the event of default without giving UFG notice and 30 days to "cure the defect." (Pl. Ex. 21).

6. In his deposition, Fisher states that he does not recall whether he communicated with Henigan and the Schramers between September 1999 and December 14, 1999.

bench trial was held on February 7 and 8, 2002.

On March 12, 2002, the trial court issued its judgment in favor of Southwest. The trial court noted that "at best" the "acceptance letter" "sets out 'the parameters of a proposed legal transaction'".... (App. Tab B. p. 2). The trial court also noted that the acceptance letter specifically refers to a formalized option and purchase contract to be executed at a later date, and that Henigan's letter dated March 10, 1999 requested that Fisher send him a copy of that contract for his review. As a result, the trial court stated that the evidence showed that the parties did not intend the acceptance letter to be the "parties' final and complete agreement." *Id.* Specifically, the trial court stated that it was not credible to believe that these experienced businessmen believed they were bound by a faxed letter concerning a $2.8 million real estate transaction.

After the appellants filed their Notice of Appeal on April 11, 2002, the trial court ordered their lis pendens notice removed from the county property records.

### DECISION

1. *Contract*

The appellants argue that the trial court erred by denying their request for specific performance. Specifically, they argue that the acceptance letter was reasonably certain and binding as to its material terms and not lacking any essential element.

■■■ When neither party has requested special findings of fact and the trial court has not gratuitously entered such findings, we review the trial court's decision under a general judgment standard. *Shelby Engineering v. Action Steel Supply,* 707 N.E.2d 1026 (Ind.App.Ct.1999). "A general judgment will be affirmed if it can be sustained upon any legal theory consistent with the evidence." *Id.* at 1027. We neither reweigh the evidence or witness credibility, but we consider only the evidence most favorable to the judgment along with all reasonable inferences that can be drawn therefrom. *Id.*

The decision whether to grant specific performance is a matter within the trial court's sound discretion. Because an action to compel specific performance sounds in equity, particular deference must be given to the judgment of the trial court. Specific performance is a matter of course when it involves contracts to purchase real estate. It is an equitable remedy, and thus, the power to compel specific performance is an extraordinary power. A party seeking specific performance of a real estate contract must prove that he has substantially performed his contract obligations or offered to do so.

*Ruder v. Ohio Valley Wholesale, Inc.,* 736 N.E.2d 776, 779 (Ind.Ct.App.2000) (citations omitted).

■■■ Here, the issue is whether the "acceptance letter" signed by Fisher on March 10, 1999, was a contract for the sale of real estate or an unenforceable agreement to agree. In *Wolvos v. Meyer,* 668 N.E.2d 671, 675 (Ind.1996) (citation omitted), our supreme court stated that resolving such an issue "involves two interrelated areas: 'intent to be bound and definiteness of terms.'" In determining the parties' intent, this court is bound by the unambiguous "language used to express their rights and duties." *McLinden v. Coco,* 765 N.E.2d 606, 611 (Ind.Ct.App. 2002). Only when a contract is ambiguous or uncertain can rules of contract construction and extrinsic evidence be considered. *Id.* Concerning whether the contract contains sufficiently definite terms, "only essential terms need be included in

order to render a contract enforceable." *Wolvos*, 668 N.E.2d at 676.

In *Wolvos*, a buyer and seller executed an option contract granting the buyer a 120–day option to purchase real estate for $160,000. If the buyer exercised the option, the seller agreed to undertake an environmental study and assume the costs of cleanup should they exceed $10,000. The option contract also provided that the "parties shall enter into a written purchase agreement on forms typically utilized by realtors and brokers in St. Joseph County." *Id.* at 673.

Within the 120–day period, the buyer notified the seller that he intended to exercise the option. After the seller received an estimate of $19,000 for environmental cleanup, buyer was notified that seller considered the contract an unenforceable agreement to agree; the seller then extended a different offer of sale. The buyer rejected that offer and brought an action for specific performance; the seller counterclaimed. The trial court granted partial summary judgment to the buyer, but the Court of Appeals reversed.

■ On transfer, the Indiana Supreme Court noted that "[w]hen one enters into an agreement with the understanding that neither party is bound until a subsequent formal written document is executed, no enforceable contract exists until the subsequent document is executed." *Id.* However, the mere reference to a formalized future contract does not void the presently existing agreement. *Id.* In that event, the court found that although the parties were obligated to enter into a more formal agreement after the option had been exercised, "the language of the agreement as a whole, . . ., unambiguously establishe[d] that the parties intended to be bound upon

the exercise of the option." *Id.* at 675. The court also found that the contract contained the essential elements for a real estate transaction. Citing *Johnson v. Sprague*, 614 N.E.2d 585, 588 (Ind.Ct.App. 1993), the court found "an enforceable contract for the sale of land where the agreement 'correctly identified the parties, the real estate, the purchase price, and the closing date,' and was signed by the party against whom enforcement was sought." *Wolvos*, 668 N.E.2d at 676.

■ We now turn to the instant case to determine whether the "acceptance letter" was an enforceable contract or an agreement to agree.[7] We note that the trial court admitted extrinsic evidence to determine that the parties did not intend to be bound. However, we are of the opinion that the évidence was erroneously admitted extrinsic evidence. *See McLinden*, 765 N.E.2d 606 (extrinsic evidence allowed only when interpreting ambiguous or uncertain contract). As such, if the language of the written document is not ambiguous, we are limited to the language of the "acceptance letter" in determining the intent of the parties. We find that the "acceptance letter" was an unambiguous expression of the parties' intent to be bound regarding their respective rights and duties concerning the sale of College Park. The only language in the "acceptance letter" which the trial court questioned regarding the parties' intent to be bound is the last sentence, which reads: "Upon acceptance, we will formalize the option and purchase contracts." (Pl. Ex. 4). However, as a matter of law, the mere reference to the making of a future formalized document does not necessarily void an otherwise unambiguous existing agreement as a whole. *Wolvos*, 668 N.E.2d 671. Therefore, we find that the "acceptance

---

7. An agreement to agree is one in which the parties intend to be "bound only after execut-

ing a subsequent written document." *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind.1996).

letter" clearly expresses an intention by the parties to be bound.

We must now consider whether the "acceptance letter" contained sufficiently definite terms to constitute an enforceable real estate transaction. As noted in *Wolvos*, only essential terms are necessary to make a contract enforceable. *See also Johnson*, 614 N.E.2d 585 (essential terms have been found to be sufficient where contract identifies parties, land, closing date, price, and signed by party against whom enforcement sought). Here, the "acceptance letter" identified the parties as Fisher, Henigan, the Schramers, Thomas Kenny (a non-party to this action), and a then unnamed organization, UFG. The acceptance letter also identified College Park as the property to be sold, a closing date of May 31, 1999, for Phase I, a down payment, a total purchase price of $1,275,000, and terms and conditions of financing, including an amortization schedule. In addition, the "acceptance letter" provided an option to purchase the remaining buildings in Phase II for a total cash purchase price of $1,530,000 and established other duties upon the parties. As a result, we find that the "acceptance letter," as signed by Fisher, was unambiguous and contained the essential terms of a contract for the sale of real estate.

### 2. Lis Pendens

The appellants also argue that the trial court erred in removing their lis pendens notice. Specifically, they argue that Indiana Code § 32–30–11–7 provides that a lis pendens notice may be removed only after a final determination of a suit. Because this case is on appeal, the appellants argue that a final determination has not been made.

▮▮▮ " 'The purpose of lis pendens or notice of lis pendens is to give effective notice to third persons of pendency of litigation affecting property and its purpose is the same in the context as a mechanic's lien.' " *National City Bank, Indiana v. Shortridge*, 689 N.E.2d 1248, 1252 (Ind.1997) (citations omitted). This "doctrine allows a party with an *in rem* interest in property, which is not otherwise recorded or perfected, to place that claim upon the public record and provide constructive notice to those dealing with the defendant." *Id.*

Upon the final determination of any suit brought:

(1) for the purposes described in section 2 or 3 of this chapter; and

(2) adversely to the party seeking to enforce a lien upon, right to, or interest in the real estate;

the court rendering the judgment shall order the proper clerk to enter in the lis pendens record a satisfaction of the lien, right, or interest sought to be enforced against the real estate. When the entry is made, the real estate is forever discharged from the lien, right, or interest.

I.C. § 32–30–11–7 (2002).

▮▮▮ The issue here is whether the judgment of the trial court concerning College Park was a final determination within the meaning of the statute. " 'When construing a statute, the legislature's definition of a word binds us. When the legislature has not defined a word, we give the word its common and ordinary meaning. In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries.' " *Koppin v. Strode*, 761 N.E.2d 455, 461 (Ind.Ct.App.2002), *trans. denied* (citation omitted).

In this case, we note that the word "final" is defined as "coming to an end," and the word "determination" means, "bring to an end." OXFORD ENGLISH DICTIONARY *available* at *http://dictio-*

*nary.oed.com.* In addition, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 851 (1976) defines the word "final" as "ending a court action or proceeding leaving nothing further to be determined by the court or to be done except the administrative execution of the court's finding but not precluding an appeal. . . ." As a result, we find that the plain and ordinary meaning of the words "final determination" would allow a trial court to remove a lis pendens notice after it had resolved the issues in the underlying action. This finding is supported by the Indiana Rules of Appellate Procedure that grant the Court of Appeals jurisdiction in appeals from the final judgments of trial courts; final judgments dispose of all claims as to all parties. Ind. Appellate Rule 5(A); 2(H)(1). If the appellants wished to preserve the status quo pending their appeal, the proper course of action would have been to apply for a stay of execution of the trial court's judgment pursuant to Indiana Trial Rule 62. After a hearing, the trial court could have suspended its judgment, preventing the sale of College Park, and ordered the appellants to post an appeal bond to protect Fisher from financial harm during the pendency of this appeal. However, as this was not done, we find that the trial court did not err in removing the appellant's lis pendens notice.

Again, we reverse the judgment of the trial court regarding specific performance in accordance with the terms of the "acceptance letter," affirm the trial court's removal of the lis pendens notice, and remand for further proceedings consistent with this opinion and to determine the amount of damages, if any, due to the appellants.

NAJAM and VAIDIK, JJ., concur.