**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**MARK F. CRINITI**
**PAUL EDGAR HAROLD**
LaDue Curran & Kuehn LLC
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**MATTHEW J. HAGENOW**
Newby, Lewis, Kaminski & Jones, LLP
LaPorte, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SALLY BRODIE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 46A03-1311-CC-442 |
| | ) | |
| VIKING DEVELOPMENT, LLC, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAPORTE SUPERIOR COURT
The Honorable Jennifer L. Koethe, Judge
Cause No. 46D03-1209-CC-1387

**January 21, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Sally Brodie appeals the trial court's grant of summary judgment to Viking Development, LLC ("Viking") on its claim against Brodie, as the guarantor of a contract, for specific performance. Brodie presents one issue for our review, which we restate as two issues:

1.  Whether the trial court erred when it awarded summary judgment to Viking.

2.  Whether the trial court abused its discretion when it ordered Brodie to specifically perform the obligations that she guaranteed.

In addition, Viking requests an award of appellate attorney's fees, which we treat as a separate issue.

We affirm the trial court's award of summary judgment to Viking and remand for a determination of reasonable appellate attorney's fees.

## FACTS AND PROCEDURAL HISTORY

In 2004, Brodie and her husband formed International Melting and Manufacturing, LLC ("International") with an approximately $2 million initial investment. The two formed the company to implement a process, developed and patented by Brodie, that would convert steel waste into a useful byproduct for other manufacturing applications. To produce the byproduct, International needed a manufacturing facility, and Indiana Melting and Manufacturing, LLC ("IMM"), a wholly-owned subsidiary of International, acquired property in LaPorte, Indiana, for that purpose.

On July 28, 2005, IMM entered into a Build Lease Agreement[1] ("the Agreement") with Viking.  Under the Agreement's terms, Viking agreed to build a manufacturing facility ("the Building") on IMM's property and lease it back to IMM.  The Agreement provided for a five-year lease term, which would begin on the completion of construction,[2] and it included a provision that set the price of rent.  Moreover, IMM received an option to purchase the Building after the third year of the lease, but, in any event, the Agreement required that IMM purchase the Building before the expiration of the lease or an extension thereof.  Specifically, the Agreement provided:

> SECTION 5.2    MINIMUM RENTAL.  For the initial five (5) year Term, [IMM] agrees to pay to [Viking] rental [sic] payable in advance in equal monthly installments on the first day of each calendar month . . . , which rent shall be in the sum of:
>
> 1.    Ten and one-half (10.5) percent of the final cost of the building, site, improvements, and soft costs.  An estimate of those costs are as follows:
> BUILDING ,SITE [sic] & SOFT COSTS
>
> TOTAL COSTS:         (currently estimated at $2,250,000)
>
> The payment based on the estimated costs is:
>
> 2.    Two Hundred Thirty-Six Thousand , [sic] Two Hundred and Fifty Dollars ($236,250.00) per Lease year, payable in installments of Nineteen Thousand, Six Hundred and Eighty-Seven Dollars and Fifty Cents ($19,687.50) per month for each month of the initial Term.  The exact amount shall be determined after total cost [sic] have been established.
>
> * * *

---

[1]  We refer to the documents as named by the parties.

[2]  The lease term began on February 1, 2007, and concluded on January 31, 2012.

SECTION 14.3    REMEDIES CUMULATIVE—NO WAIVER.    The various rights and remedies herein contained and reserved to each of the parties shall not be considered as exclusive of any other right to [sic] remedy of such party, but shall be construed as cumulative and shall be in addition to every other remedy now or hereafter existing at law, in equity, or by statute, and said rights and remedies may be exercised and enforced concurrently and whenever and as often as occasion therefore arises. . . .

\* \* \*

SECTION 14.10    PURCHASE.    [IMM] is hereby granted an option to purchase the Premises which it may exercise at the end of the third (3rd) Lease Year . . . .    This option may be exercised by [IMM] notifying [Viking] under this Lease at the time it exercises the option.  This option may be exercised by [IMM] notifying [Viking] in writing of its exercise of this option by mailing a written notice to [Viking] . . . no later than ninety (90) days prior to the end of the third (3rd) Lease Year.  The closing of the purchase of the Building will be held on the last day of the third (3rd) Lease Year or such other date as the parties shall agree.

Prior to the close of the term of the lease [sic] or any extension thereof, if [IMM] has not exercised its option, [IMM] shall purchase the Building. The purchase price of the building [sic] shall be the cost as set forth in Section 5.2 plus Five percent (5%). . . .

Appellant's App. at 27-28, 37, 39.

Also on July 28, Brodie signed an Absolute Guaranty ("Guaranty"), which

provided:

In consideration of and as an inducement to [Viking] . . . to enter into a particular Build/Lease Agreement dated the 28th day of July, 2005, between Viking and [IMM] . . . , and Viking relies on this guaranty or agreement by Sally Brodie . . . .[3]

Brodie unconditionally guarantees the due and punctual payment of all rents and other payments provided for under the agreement, and all other sums due, including interest and penalties, and to be paid to IMM [sic] pursuant to the agreement and performance by IMM of all the terms, covenants[,] and agreements of the agreement, and Brodie agrees to pay all of Viking's costs, expenses[,] and reasonable attorney's fees incurred in

---

[3]    Our ellipses indicate omissions of party name designations and locations only; the incompleteness of this paragraph is as written in the Guaranty.

4

enforcing the covenants and agreements of IMM in the agreement[] or incurred by Viking in enforcing this guaranty.

Brodie waives notice of the acceptance of this agreement, presentment, protest, notice of protest[,] and any and all demands for performance or any and all notices of non-performance that might otherwise be a condition precedent to the liability of Brodie under this guaranty[,] and Brodie covenants and agrees that Viking may proceed directly against Brodie, without first proceeding or making claim [sic] or exhausting any remedy against IMM or pursuant any [sic] particular remedy or remedies available to Viking.

Brodie covenants and agrees that, without releasing, diminishing[,] or otherwise affecting the liability or [sic] guarantor or the performance of any obligation contained in the guaranty and without affecting the rights of Viking, Viking may, at any time and from time to time, and without notice to or further consent of Brodie:

a) Make any agreement extending or reducing the term of the agreement otherwise [sic] altering the terms of payment of all or any part of the rent, or granting an indulgences [sic] with respect these [sic] matters, or modifying or otherwise dealing with the agreement[.]

Id. at 44. The Guaranty also waived the right to a jury trial, and it included a choice of law provision, which designated Indiana law as controlling.

Two years after execution of the Agreement and the Guaranty, in July 2007, engineering and design problems pushed the Building project over budget, and IMM lacked the capital to complete the venture. Thus, International partnered with Steel Dynamics, Inc. ("SDI") and formed Dynamic Abrasives, LLC ("Dynamic").[4] SDI contributed a $4.5 million loan[5] to Dynamic for operating expenses, and International contributed its interest in IMM, which included the LaPorte land and the Agreement with

---

[4] Initially, International owned eighty-two percent of Dynamic and SDI owned the remaining eighteen percent.

[5] SDI loaned IMM the $4.5 million in October 2007.

Viking. Dynamic assumed control of the manufacturing operations at the building. To account for this change and for the nearing completion of construction, on July 26, 2007, Viking and IMM modified the Agreement. The modification, titled Second Addendum to Build Lease Agreement[6] ("Addendum"), sought to "clarify and modify the Agreement." Id. at 52. Accordingly, the Addendum stipulated:

> NOW, THEREFORE, IN CONSIDERATION of the mutual promises contained herein, it is agreed as follows:
>
> 1. **Costs and Adjustments.**
>
> a) Parties agree that the cost of project as of the date of this document is $2,896,961.00, and that said cost includes estimates for work not completed as of the date of this Agreement. That[,] based on the cost[,] the monthly installments shall be Twenty-Five Thousand Three Hundred and Forty-Eight Dollars ($25,348.00)[.]
>
> * * *
>
> The estimated cost of the aforedescribed uncompleted work is Thirty-Nine Thousand Five Hundred Dollars ($39,500.00).
>
> b). [sic] Upon completion of the aforedescribed work, [Viking] shall provide [IMM] with evidence as to the actual cost of the building and breaking [sic] out separately the cost of the uncompleted work. In the event that the actual cost of the uncompleted work shall be less than the estimated cost, [IMM] shall receive a credit against the cost in an amount equal to the difference between the estimated cost and the actual cost. If the actual cost shall exceed the estimate[,] there shall be no adjustment to the Agreement. There shall be no other adjustments in the actual cost.
>
> 2. **Purchase.**
>
> Section 14.10 of the original Agreement provides the [sic] [IMM] to purchase the building. Said provisions are modified to add the following:
>
> In the event that [IMM] should purchase the building within twenty-four (24) months of the date of this document, the purchase price of the

---

[6] The parties executed the first addendum on October 7, 2005; it is not relevant to this appeal.

building shall be the actual cost and shall not include the five percent (5%) as provided in the Agreement. Any purchase after twenty-four (24) months from the date of this document shall be cost plus five percent (5%) as provided in the original Agreement.

3.    **<u>Structural Change.</u>**

[International, t]he parent company of [IMM,] has negotiated to transfer all its interest of [IMM] to newly [sic] created limited liability company, Dynamic Abrasives, LLC, an Indiana limited liability company, in which it and a [sic] affiliate of [sic] Steel Dynamics, Inc. will hold all interests. This Agreement as it has been amended herein shall continue in full force and effect under such new ownership of [IMM]. . . .

<u>Id.</u> 52-53.

Under the control of Dynamic, budgetary woes continued to trouble the project, and design problems with the Building's manufacturing lines ultimately caused the project to fail. As a result, on July 17, 2009, Dynamic defaulted on its loan obligations to SDI, and, in turn, SDI converted the outstanding amounts owed into equity of Dynamic. When this occurred, SDI became the owner of ninety percent of Dynamic, which left International with the remaining ten-percent share. SDI took entire control over the Agreement and the operations at the Building but retained Brodie as a consultant. Brodie requested a release from the Guaranty, but Viking declined.

After 2010, Brodie was not involved with the Building or its operations, and she had no communications with Viking after SDI took over Dynamic's operations until Viking mailed Brodie a demand letter on February 7, 2012. The letter asserted that IMM had defaulted on its obligations under the Agreement and demanded that Brodie fulfill her promises under the Guaranty. Specifically, the letter charged that IMM failed both to make the final rental payment under the lease, "which was due on or before January 31,

7

2012," and to purchase the Building before the expiration of the lease term. Id. at 56.

Therefore, the letter commanded that Brodie, as unconditional guarantor of IMM's

performance, purchase the Building for $3,041,809. Brodie immediately contacted SDI

and learned that a dispute had developed between it and Viking over the Agreement.

Brodie, who had the impression that Viking and SDI were working to resolve the

conflict, did not comply with the letter's demand. Consequently, on September 28,

Viking filed suit against Brodie and sought specific performance of the Agreement.

Several months later, on April 26, 2013, Viking and Brodie filed cross motions for

summary judgment. Viking argued that, as a guarantor of IMM's obligations under the

Agreement, Brodie was required to purchase the Building. It argued that Brodie should

pay the full cost of construction plus 5% for a total amount of $3,064,971. Brodie argued

that both the Agreement and the Addendum were unenforceable under the Statute of

Frauds because she signed neither document and because both documents failed to state

two essential terms: purchase price and a closing date. After a hearing, the trial court

entered summary judgment for Viking and against Brodie. In so doing, the court entered

findings and conclusions as follows:

> 8. . . . [T]he Court finds that there is no ambiguity in the
> Agreement and subsequent Second Addendum to the Agreement and the
> parties' agreed intent was for IMM to purchase of [sic] the Building for
> $2,986,961.00 plus 5% for a total in the amount of $3,041,809.00. The
> Second Addendum included in the purchase price estimates for work not
> yet completed and Viking agreed to waive any additional cost exceeding
> the estimates . . . . The only possible adjustment to the purchase price
> would have been if the actual cost of the work would have been less than
> the estimated cost. If the cost would have been less, th[e]n IMM would
> have been entitled to a credit off of the purchase price. However, there is
> no evidence to suggest that the actual cost was less than the estimated cost.
> In fact, the . . . designated . . . evidence by Viking was undisputed and

8

indicated that the actual cost of the building was $2,919,020.00. Pursuant to the terms of the Second Addendum, the additional cost of the work completed by Viking has been waived. The Court finds that the Second Addendum contains the essential term of price in the amount of $2,896,961.00 plus 5% for a total in the amount of $3,041,809.00 and Brodie's Motion for Summary Judgment on this issue IS DENIED.

9. Further, the Court finds that although the parties failed to designate a specific closing date, the lack of a specific closing date does not invalidate the Agreement because the law implies a reasonable time. What is considered reasonable depends on the subject matter of the contract, the circumstances surrounding the performance and the situation of the parties. The evidence designated by Viking indicates that Viking immediately contacted Brodie at the close of the Agreement and Second Addendum, regarding the purchase of the Building. The Court finds it would be reasonable to imply a closing date within thirty (30) days of Viking's notice to Brodie on February 7, 2012. Therefore, Brodie's Motion for Summary Judgment on the closing date issue IS DENIED.

10. Lastly, there is no dispute that the Agreement and Guarantee were entered into contemporaneously and as an inducement for Viking to enter into the Agreement with IMM. . . . The contemporaneous doctrine provides, in the absence of anything to indicate a contrary intention, a writing executed at the same time and relating to the same transaction will be construed together in determining the contract. Further, documents involving the same transaction, which are executed at different times[,] may also be construed together. Pursuant to the Statute of Frauds, for an agreement to purchase real estate to be enforceable[,] it must be in writing and signed by the party against whom enforcement is sought. Here, the Agreement was executed contemporaneously with the Guarantee and the Court will construe the documents together in determining the contract. In the Guarantee, Brodie waived notice of the Second Addendum to the Agreement which indicates the purchase price of the Building. Therefore, Brodie's argument that the purchase clause of the lease agreement is unenforceable because Brodie did not sign it . . . fails based upon her execution of the Guarantee and waiver of notice contained therein and her motion for summary judgment on this issue is DENIED. . . .

12. Based upon the reasoning outlined above, the Court finds that the Agreement[,] together with the Second Addendum and Guarantee[,] identifies the parties, the real estate[,] and the purchase price and is enforceable under the Statute of Frauds. Therefore, there are no issues of material fact in dispute and Viking is entitled to summary judgment as a matter of law against Brodie for specific performance of the purchase of the

Building. The purchase price of [the] Building is in the amount of $2,896,961.00 plus 5% for a total in the amount of $3,041,809.00. . . .

Id. at 4-7.

The trial court then ordered specific performance of the contract and commanded that Brodie purchase the building for $3,041,809. The court also awarded pre- and post-judgment interest at a rate of 8% from March 7, 2012, the implied closing date. Finally, pursuant to the Agreement, the court awarded attorney's fees and costs to Viking. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Summary Judgment

Brodie contends that the trial court erred when it awarded summary judgment to Viking. Summary judgment is appropriate if, drawing all reasonable inferences in favor of the nonmoving party, the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Hughley v. State, 15 N.E.3d 1000, 1003 (Ind. 2014). "Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law." TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust, 904 N.E.2d 1285, 1287-88 (Ind. Ct. App. 2009). Thus, our standard of review is de novo, and, although trial court findings aid our review, they do not bind this court. Peoples Bank & Trust Co. v. Price, 714 N.E.2d 712, 716 (Ind. Ct. App. 1999), trans. denied.

Brodie contends that summary judgment in favor of Viking was inappropriate for several reasons: (1) the Agreement and Addendum are unenforceable under the Statute

10

of Frauds because they fail to state a purchase price; (2) the Agreement is unenforceable under the Statute of Frauds because it does not state a closing date; (3) the Addendum is unenforceable under the Statute of Frauds because Brodie did not sign it; and (4) the Addendum materially altered the obligations that Brodie guaranteed and, therefore, discharged her commitments.

However, Viking responds that Brodie failed to argue to the trial court that (1) she did not sign the Addendum and (2) the Addendum materially altered her obligations. Viking, therefore, contends that Brodie has waived these arguments for appeal. But Brodie argued to the trial court that the Addendum was unenforceable under the Statute of Frauds because "she did not sign the Lease." Appellant's App. at 106. Thus, we first hold that Brodie's argument that she did not sign the Addendum was within the issues before the trial court and is not waived. See Showalter v. Town of Thorntown, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009), trans. denied. But Brodie did not present her material-alteration argument to the trial court; nor can we fairly state that this argument is within those issues actually presented. Id. Therefore, we also hold that Brodie has waived her material-alteration argument for appeal. We address the remainder of Brodie's arguments in turn.

### Purchase Price

Brodie contends that neither the Agreement nor the Addendum contained the purchase price of the building and that the trial court impermissibly relied on parol evidence, an affidavit, to supply the price term. We disagree.

11

Indiana courts "zealously defend the freedom to contract." Price, 714 N.E.2d at 716. "The parties to a contract have the right to define their mutual rights and obligations as they see fit." S., Sch. Bldgs., Inc. v. Loew Elec., Inc., 407 N.E.2d 240, 244 (Ind. Ct. App. 1980). "[C]ontracting parties are free to allocate risks as they choose." Dutchmen Mfg., Inc. v. Reynolds, 849 N.E.2d 516, 524 (Ind. 2006). Thus,

> [t]he unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument. . . . In interpreting a written contract, the court should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties. The contract is to be read as a whole when trying to ascertain the intent of the parties. The court will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. The court must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. Moreover, in the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject matter will, as a general proposition, be construed together.

Price, 714 N.E.2d at 716-17 (citations omitted). Indeed, "[e]ven if documents are executed at different times, they may still be construed together as long as they relate to the same transaction." Gold v. Cedarview Mgmt. Corp., 950 N.E.2d 739, 743 (Ind. Ct. App. 2011).

Here, we have a contract for the sale of land, which falls within Indiana's Statute of Frauds. Ind. Code § 32-21-1-1(b)(4) (2008). As we have explained, "[t]he Statute is designed to preclude fraudulent claims which would probably arise when one person's word is pitted against another's, and to prevent opening wide the floodgates of litigation." Johnson v. Sprague, 614 N.E.2d 585, 588 (Ind. Ct. App. 1993). "Once the existence of a

12

contract is established, the policy behind the statute is fulfilled, and the only remaining task is to ascertain the precise terms of the contract." Wehry v. Daniels, 784 N.E.2d 532, 536 (Ind. Ct. App. 2003). A contract need only include the essential terms to be enforceable. Conwell v. Gray Loon Outdoor Mktg. Grp., Inc., 906 N.E.2d 805, 813 (Ind. 2009). The essential terms need only be defined with reasonable certainty; absolute certainty is not required. Id. Thus, to be enforceable under the Statute of Frauds, land-sale contracts "must be evidenced by some writing: (1) which has been signed by the party against whom the contract is to be enforced or his authorized agent; (2) which describes with reasonable certainty each party and the land; and, (3) which states with reasonable certainty the terms and conditions of the promises and by whom and to whom the promises were made." Johnson, 614 N.E.2d at 588.

We agree with Brodie that contracts "required to be in writing must completely contain the essential terms without resort to parol evidence." Coca-Cola Co. v. Babyback's Int'l, Inc., 841 N.E.2d 557, 565 (Ind. 2006). We also agree that price is an essential term to a land-sale contract. See, e.g., Wertheimer v. Klinger Mills, Inc., 216 Ind. 481, 25 N.E.2d 246, 248 (Ind. 1940) ("[W]here a writing purporting to set out a contract fails to include the agreed consideration[,] such contract must be held to be a parol contract . . . ."); Tracy v. Morell, 948 N.E.2d 855, 865 (Ind. Ct. App. 2011) ("The essential terms, including both the sale and the sale price, were based on a mutual mistake . . . ."). However, we share the trial court's view that the Addendum supplied the price term, and there is no dispute that the Addendum is part of the contract between IMM and Viking. See DiMizio v. Romo, 756 N.E.2d 1018, 1022 (Ind. Ct. App. 2001)

13

("Under the common law of contracts, a written agreement may be modified by a subsequent written agreement so long as there exists consideration to support the modification."), trans. denied. Thus, we read the Agreement and the Addendum together in a way that harmonizes their provisions.

In essence, Brodie attempts to negate the contract between IMM and Viking by demanding a level of specificity in contractual language that Indiana law does not require.[7] We have previously held that, "[t]o be enforceable, contracts must be sufficiently definite, and amounts and prices must be fixed or subject to some ascertainable formula." Zukerman v. Montgomery, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011) (emphasis supplied). The Addendum meets this standard; at the least, it provides an ascertainable formula to determine the purchase price of the building.[8] Section 5.2 provided an estimate for the work to be completed by Viking, and it contemplated a future agreement that would give more precision, which the Addendum supplied.[9] Although the $2,896,961 figure that the Addendum furnished included estimates for work

---

[7] To the extent that Brodie argues that reasonable certainty suffices for non-essential terms of a contract but that something more is required for essential terms, her argument is without merit. Under Indiana law, a contract need only contain the essential terms and "[a]ll that is required to render a contract enforceable is reasonable certainty in the terms and conditions of the promises made . . . ." Conwell, 906 N.E.2d at 813.

[8] Because the Addendum is part of the contract between IMM and Viking and because the price term supplied by the Addendum satisfies that Statute of Frauds, we do not reach the question of whether the estimate in the Agreement would individually satisfy the Statute. Indeed, although indefiniteness of terms may prevent the enforcement of an agreement, "[s]ubsequent conduct of one or both parties may remove" the "obstacle" of indefiniteness to enforcement. Restatement (Second) of Contracts § 34 cmt. c (1981).

[9] We note that parties may enter into an enforceable agreement that "obligates them to execute a subsequent final written agreement" provided that agreement was initially expressed on all essential terms that are to be incorporated into the final document. Sands v. Helen HCI, LLC, 945 N.E.2d 175 180 (Ind. Ct. App. 2011) (citing Wolvos v. Meyer, 668 N.E.2d 671, 674 (Ind. 1996)). "In other words, the document is understood to be a mere memorial of the agreement already reached and may not contain a material term that is not already agreement on." Id.

to be completed, the Addendum provided an ascertainable formula to determine the purchase price of the building. In particular, the unambiguous language of the Addendum called for IMM to pay a maximum amount of $2,896,961, which the Addendum defined as the "actual cost" of the Building. Appellant's App. at 52. If the cost for the uncompleted work was less than that amount, IMM would receive a credit for the difference, but, if the cost to complete the building exceeded that amount, the actual cost would be deemed the figure provided in the agreement. In any event, Viking agreed to supply IMM "with evidence as to the actual cost of the building." Id. at 52.

The Addendum further modified Section 14.10 the Agreement to change the purchase price of the building to the "actual cost," discussed above. Id. at 53. Most importantly, the parties agreed that, if IMM purchased the building within twenty-four months of the date of the Addendum, the total price that IMM would pay would be the actual cost of construction—$2,896,961, less any credit that IMM might receive. However, if IMM purchased the building after the twenty-four month window, it agreed to pay "cost plus five percent (5%)," or $3,041,809, the price that the trial court ordered Brodie to pay. Thus, Brodie's argument that the term "cost" in this provision of the Addendum is ambiguous neglects to consider that term in the context of, and in harmony with, the other provisions of the contract.

We therefore hold that the Addendum provided the purchase price for the Building sufficient to satisfy the Statute of Frauds. The formula provided in the Addendum is ascertainable, even if an affidavit, which simply designated that the total cost of construction exceeded the estimates in the Addendum for uncompleted work, was

15

necessary to complete the equation. The affidavit in question merely told the trial court to rely on the figure specified in the Addendum itself; it did not supply a missing essential term but, instead, provided more certainty to an already reasonably certain term of the contract.

Closing Date

Brodie next argues that the closing date is an essential term that must be included in a land-sale contract. We cannot agree. The failure of a contract to specify a time for performance

> is an ancient and often encountered problem, and the law has long ago addressed it. When the parties to an agreement do not fix a concrete time for performance, the law implies a reasonable time. What constitutes a reasonable time depends on the subject matter of the contract, the circumstances attending performance of the contract, and the situation of the parties to the contract. It is a question of fact.

Harrison v. Thomas, 761 N.E.2d 816, 818-19 (Ind. 2002) (citations omitted) (rejecting the argument that construing a provision in a land-sale contract to allow the fulfillment of a condition after the contract's stated closing date could tie up the property indefinitely).

Brodie relies on our opinion in Johnson for the proposition that the closing date is an essential term of the contract. But, as Viking correctly points out, Johnson does not say what Brodie declares. In Johnson, we held that a memorandum contained all essential terms to form a contract when the memorandum "identified the parties, the real estate, the purchase price[,] . . . the closing date, . . . included Johnson's signature[,]" and was "accompanied by a check as down payment for the purchase price." 614 N.E.2d at 590. Notably, we did not say that each and every one of those things was required in every case. And, here, neither the subject matter of the contract, the circumstances

16

attending performance, nor the situation of the parties would support a definite closing date. See Harrison, 761 N.E.2d at 818-19. Before construction commenced, the parties contemplated a five-year lease term, to begin on the completion of construction, and a two-year window during the lease within which IMM could purchase the Building. Thus, to invalidate the agreement for failing to state a specific closing date would contravene the parties' agreement. Therefore, we also affirm the trial court's judgment on this issue.

Signature on Addendum

Next, Brodie contends that the Addendum is unenforceable against her under the Statute of Frauds because she did not sign it. This, she concludes, means that any price term supplied by the Addendum would be unenforceable against her. But this argument misses the mark.

"A guaranty is . . . a promise to answer for the debt, default, or miscarriage of another person. It is an agreement collateral to the debt itself and represents a conditional promise whereby the guarantor promises to pay only if the principal debtor fails to pay." S-Mart, Inc. v. Sweetwater Coffee Co., 744 N.E.2d 580, 585 (Ind. Ct. App. 2001) (citations omitted), trans. denied. "[A] guaranty need only be in writing and signed by the guarantor in order to be valid." Grabill Cabinet Co. v. Sullivan, 919 N.E.2d 1162, 1168 (Ind. Ct. App. 2010). Here, Viking, the guaranteed party, seeks to enforce the Guaranty against Brodie, the guarantor, which is an agreement collateral to the Addendum itself. The Guaranty is both in writing and signed by Brodie, and, therefore, it satisfies the Statute of Frauds. In sum, given that Brodie admits to having signed the

17

document that Viking seeks to enforce, she has no statute of frauds defense on the grounds that she did not sign the Second Addendum.

In effect, by arguing that the signature on the Addendum does not satisfy the Statute of Frauds, Brodie attempts to assert a defense belonging to IMM, the principal debtor. But she cannot do so. "It is well-settled . . . that only parties and privies have the right to plead the statute of frauds." Pioneer Lumber & Supply Co. v. First-Merchants Nat'l Bank of Michigan City, 169 Ind. App. 406, 349 N.E.2d 219, 223 (1976). But "normally a surety lacks privity with its principal since the surety's privity with his principal is in the contract and not in the cause of action." Ind. Univ. v. Ind. Bonding & Sur. Co., 416 N.E.2d 1275, 1286 n.9 (Ind. Ct. App. 1981) (citations and quotations omitted). Thus, for purposes of the Guaranty, Brodie is not in privity with IMM and cannot raise any statute of frauds defenses that IMM might assert in a cause of action against it. But, even if she were in privity with IMM, she would stand in IMM's shoes, which means that IMM's signature, not Brodie's, would satisfy the Statute of Frauds, and IMM signed that document through its authorized agent. Thus, we affirm the trial court on this issue.

**Issue Two:  Specific Performance**

Brodie also contends that specific performance is an inappropriate remedy because Viking is a seller and because Viking did not prove that damages were an inadequate remedy.[10]  As we explained in UFG, LLC v. Southwest Corp., 784 N.E.2d 536, 543 (Ind. Ct. App. 2003) (citation's omitted), trans. denied:

---

[10]  Viking also contends that Brodie failed to raise this argument in front of the trial court and, therefore, has waived it on appeal.  But, because the trial court awarded specific performance, we hold

18

The decision whether to grant specific performance is a matter within the trial court's sound discretion. Because an action to compel specific performance sounds in equity, particular deference must be given to the judgment of the trial court. Specific performance is a matter of course when it involves contracts to purchase real estate. It is an equitable remedy, and thus, the power to compel specific performance is an extraordinary power. A party seeking specific performance of a real estate contract must prove that he has substantially performed his contract obligations or offered to do so.

Further:

The equitable doctrine is that the enforcement of contracts must be mutual, and, the vendee being entitled to specific performance, his vendor must likewise be permitted in equity to compel the acceptance of his deed and the payment of the stipulated consideration. This remedy is available, although the vendor may have an action at law for the purchase money. . . .

. . . While the reasons for awarding specific performance to vendors may be less compelling than the reasons for awarding specific performance to purchases following a vendor's breach, the remedy is available nonetheless.

We also note that the contract [that] was agreed to by the Buyers and Sellers included terms on Sellers' remedies in the event of Buyers' default. According to those terms, . . . Sellers may pursue whatever remedies, legal or equitable, are available to collect the entire unpaid balance of the purchase price. This clause indicates that the parties agreed that specific performance was an acceptable and valid remedy. As a general rule, the law allows persons of full age and competent understanding the utmost liberty in contracting. Contracts, when entered into freely and voluntarily, will be enforced by the courts. . . . [W]e will not invalidate a remedy for which the Sellers contracted.

Humphries v. Ables, 789 N.E.2d 1025, 1035-36 (Ind. Ct. App. 2003) (internal citations and quotation marks omitted).

Here, Viking contracted for specific performance as a remedy, in both the Agreement and the Guaranty, and, thus, Viking was entitled to that remedy. Although it

that this argument was within the issues before the trial court and is not waived. See Showalter, 902 N.E.2d at 342.

is true, as Brodie argues, that specific performance is an extraordinary remedy, it is also not uncommon in real estate transactions. See UFG, LLC, 784 N.E.2d at 543. Viking substantially completed its contract obligations, namely, it constructed the building. And, given the unique nature of IMM's business and given that the Building was constructed precisely for that business, we cannot say that the trial court abused its discretion. Therefore, we affirm the trial court's order of specific performance.

### Issue Three: Attorney's Fees

Pursuant to the Guaranty, Viking requests an award of appellate attorney's fees. "Generally, the right to recover attorney's fees from one's opponent does not exist in the absence of a statute or some agreement." Daimler Chrysler Corp. v. Franklin, 814 N.E.2d 281, 286 (Ind. Ct. App. 2004). "When a contract provision provides that attorney fees are recoverable, appellate attorney fees may also be awarded." O'Brien v. 1st Source Bank, 868 N.E.2d 903, 909 (Ind. Ct. App. 2007).

Here, in relevant part, the Guaranty provides:

> Brodie agrees to pay all of Viking's costs, expenses[,] and reasonable attorney's fees incurred in enforcing the covenants and agreements of IMM in the agreement[] or incurred by Viking in enforcing this guaranty.

Appellant's App. at 44. Viking has prevailed in defending this appeal, and, therefore, we remand to the trial for a calculation of reasonable appellate attorney's fees to which Viking may be entitled, if any.

### CONCLUSION

We affirm the trial court's award of summary judgment to Viking and against Brodie, and we hold that the court did not abuse its discretion when it ordered specific

performance. Finally, we remand to the trial for a calculation of Viking's reasonable attorney's fees, if any.

Affirmed and remanded.

BAILEY, J., and PYLE, J., concur.