FILED

Mar 11 2019, 5:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Thomas R. Malapit, Jr.
Joshua A. Brown
Ryan L. Groves
Barry A. Hall
McKinney & Malapit Law
Muncie, Indiana

ATTORNEY FOR APPELLEES

Michael L. Carmin
Carmin Parker, PC
Bloomington, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William J. Huff, II Revocable Trust Declaration, Dated June 28, 2011 and Nicole E. Huff Revocable Trust Declaration, Dated June 28, 2011, | March 11, 2019 |
| | Court of Appeals Case No. 18A-PL-1123 |
| *Appellants-Defendants,* | Appeal from the Monroe Circuit Court |
| v. | The Honorable J. David Holt, Senior Judge |
| Michael O. Cain and Linda A. Raymond, | Trial Court Cause No. 53C06-1804-PL-755 |
| *Appellees-Plaintiffs.* | |

**Kirsch, Judge.**

[1]     William J. Huff, II Revocable Trust Declaration, Dated June 28, 2011 and

Nicole E. Huff Revocable Trust Declaration, Dated June 28, 2011 (collectively,

"the Huffs") appeal from the trial court's grant of a preliminary injunction in favor of Michael O. Cain and Linda A. Raymond (collectively, "Cain"). The Huffs present one issue on appeal, which we restate as: Whether the trial court abused its discretion when it issued a preliminary injunction enjoining the Huffs from using certain easements to cut and remove timber from their real estate.

We vacate and remand.

## Facts and Procedural History[1]

In 1990, Kenton L. Robinson ("Robinson") was the owner of real estate in Monroe County, Indiana. On March 12, 1990, Robinson granted an easement ("the Grant of Easement") to Terre Haute Real Estate Corporation ("THR"), the then owner of property adjacent to Robinson's property. *Appellants' App. Vol. 2* at 53-56. Subsequently, Robinson conveyed his real estate, and it became The Shores subdivision ("The Shores"). Cain is the current owner of Lot 9 in The Shores and holds an undivided interest in certain common areas of The Shores, including an area known as the Common Nature Preserve. *Tr.* at 59-61. The Huffs are the current owners of the real estate adjacent to The Shores ("the Huff Real Estate"), previously owned by THR, and the successors in interest to the Grant of Easement.

---

[1] Oral argument was heard on this case on December 12, 2018 in the Indiana Supreme Court courtroom in Indianapolis, Indiana. We commend counsel on the quality of their written and oral advocacy.

[4]     The Grant of Easement contains three separate easements through The Shores. Easement No. 1 provides "a private, non-exclusive surface easement for ingress and egress over and along the roadway for The Shores as depicted in the plat thereof." *Appellants' App. Vol. 2* at 29-30. Easement No. 1 is Shady Side Drive, the principal road serving The Shores and ending in a cul-de-sac on the south end of the subdivision. *Tr.* at 33.

[5]     Easement No. 2 provides "a fifty (50) feet wide private driveway easement over Lot 9 and the Common Nature Preserve of [T]he Shores . . . ." *Appellants' App. Vol. 2* at 30. Easement No. 2 also provides in relevant part, "Grantee shall limit its use of the driveway easement for the construction and development of and use by not more than four of the six single family residences allocated to Grantee's real estate . . . ." *Id*. Easement No. 2 further provides, "Grantee covenants to maintain the driveway easement in a sightly manner, at the expense of Grantee or its assigns." *Id*.

[6]     Easement No. 3 provides "a fifty (50) feet wide private driveway easement extending from the south end of the roadway within The Shores . . . and over Lot 1 and the Common Nature Preserve near the west property line of The Shores . . . and as more particularly described in Exhibit C . . . ." *Id*. at 31. Easement No. 3 is an ingress and egress easement over Lot 1 and part of the Common Nature Preserve and connects The Shores to a part of the Huffs Real Estate. *Id*. at 12. Easement No. 3 also provides in relevant part, "Grantee's use of this Easement No. 3 shall be limited to construction and development of and use by not more than three of the six single family residences allocated to

Grantee's real estate . . . ." *Id*. at 31. Similar to Easement No. 2, Easement No. 3 provided, "Grantee covenants to maintain the driveway easement in a sightly manner, at the expense of Grantee or its assigns." *Id*.

[7] The General Conditions portion of the Grant of Easement further provides in relevant part as follows:

> 1. The grant of driveway easement and surface easements as described hereinabove includes such access by Grantee, its invitees or licensees as is necessary from time to time to repair, restore, maintain or replace water lines or sewer lines or other utilities located within the described easement and to repair, maintain or improve the driveways.

> 2. Grantee covenants to limit use of the easements above described, for the construction, development and use by Grantee and its grantees and assigns of six (6) single family residential structures, each of which may include guest and caretaker quarters and other buildings attendant thereto, to be located on Grantee's real estate described in Exhibit A and as more particularly described above.

> 3. The Shores Homeowners Association, Inc. and its members shall have the right to enforce the within covenants and restrictions by court injunction obtained by due process of law.

> *Id*.

[8] The Grant of Easement between Robinson, then owner of the land that would eventually become The Shores, and THR, then owner of the Huff Real Estate, was the result of negotiation and dispute by THR on its belief that the platting

and development of The Shores landlocked its property. The limitation on use of the easements as described in the Grant of Easement for the benefit of the THR property, now the Huff Real Estate, was limited to construction, development and use of six single family residences and attendant structures and was an expressly negotiated term, as stated by the attorney representing THR at that time, "that's all Mr. Robinson would agree to." *Tr.* at 147-53.

[9] The Huff Real Estate was comprised of approximately 193 acres, acquired from THR, and approximately 44 acres, known as the Chumley parcels, adjacent to The Shores. The Huff Real Estate is heavily wooded and hilly land, and access by land to the Huff Real Estate is via the three access easements. After the Huffs acquired their land, they enlisted the services of Ralph Unversaw ("Unversaw"), District Forester for the Indiana Department of Natural Resources' Division of Forestry ("DNR"), who developed a Stewardship Plan specifically for the Huff Real Estate, which was finalized in July of 2017. *Appellants' App. Vol. 2* at 69-95. Unversaw described the Huff Real Estate as about 249 acres, all of which is forested and located partially on Lake Monroe adjacent to The Shores. *Id.* The Stewardship Plan included certain well-delineated goals for the Huff Real Estate, including to improve the stand of trees, improve the wildlife habitat, control exotic and invasive species, provide an enjoyable place to recreate, selectively harvest trees throughout the woods in the future, develop four home sites, provide better access throughout the property, and develop fire trails. *Id.* at 70.

[10]     As a part of implementing the Stewardship Plan, and pursuant to the Grant of Easement, the Huffs hired Logan Freeman ("Freeman") to clear out the easements. *Tr.* at 187-88. During the time he was working on the Huff Real Estate, Freeman worked about five days a week and eight to ten hours each day. *Id.* As a part of clearing the easements, Freeman brought in approximately 100 tri-axle dump trucks of stone through The Shores and the easements and did not receive any complaints from Cain or anyone in The Shores. *Id.* at 188-89.

[11]     During roughly the same time that Freeman was working on the Huff Real Estate, the Huffs hired Ohio River Veneer to begin the process of harvesting the timber on the Huff Real Estate, and the company applied for a logging permit from the director of the Monroe County Planning Department ("the Planning Department"). *Id.* at 7, 27. In June 2017, after several delays, the Planning Department refused to issue a logging permit to Ohio River Veneer and the Huffs. The Planning Department explained that it had been contacted by landowners in The Shores who believed that the language of the Grant of Easement limited the easements to "construction, development and use by a maximum of six single family homes and that their utilization for logging activities would 'overburden' the easements and is not allowed." *Appellants' App. Vol. 2* at 98. The Planning Department further stated, "[u]ntil the Grant of Easement is amended to expand the permissible uses to allow logging activities or there is a court order that declares that the proposed logging activities are

allowed by the existing easement language, our office would be unable to issue a logging permit." *Id.*

[12]     After reviewing Indiana statutes and consulting with attorneys, the Huffs determined that a logging permit was not needed when harvesting timber outside of an urban area, and they subsequently withdrew their application for a logging permit. *Tr.* at 127. One statute relied on by the Huffs was Indiana Code section 36-7-4-1103(c), which states, "This chapter does not authorize an ordinance or action of a plan commission that would prevent, outside of urban areas, the complete use and alienation of any mineral resources or forests by the owner or alienee of them." After consulting with a civil engineer, the Huffs determined that 98% of the Huff Real Estate is outside of an urban area. *Id.* at 135-36. Notwithstanding section 36-7-4-1103(c), the Planning Department noted that a permit was still necessary because Monroe County had an ordinance that "predates the statute" and requires a permit that can be obtained after showing that the applicant is using "best management practices" and shows a legal right to the timber and "a way of getting the logs . . . out . . . through a . . . valid ingress or egress easement that would allow logging." *Id.* at 14.

[13]     In December 2017, the Huffs entered into a contract with Tri-State Timber ("Tri-State") to cut and remove trees from the Huff Real Estate. *Id.* at 169-70. The Huffs were to receive a percentage of the proceeds from the sale of the removed trees. In April 2018, Tri-State filed an application for a logging permit with the Planning Department. *Id.* at 13,98. The logging permit application,

citing "Zoning Ordinance 825," warned that special restrictions on tree harvesting may apply to lands in the Lake Monroe watershed and provided that logging as part of land clearing for further development may require a grading permit. *Pls.'s Ex.* E. The form further advised that failure to obtain a grading permit before clearing land for development purposes was an ordinance violation subject to fines and other legal action. *Id.* The Planning Department did not grant the permit. *Tr.* at 16-17. After being told by the Planning Department that the logging permit would not be issued, Tri-State made the determination to start harvesting again because it thought that it had the legal right to practice forestry outside an urban area pursuant to Indiana Code section 36-7-4-1103(c). *Id.* at 181. Around April 10, 2018, Tri-State began harvesting the timber on the Huff Real Estate, and Tri-State expected the work to be finished in approximately ten weeks, weather permitting. As part of its logging activities, Tri-State drove large commercial logging trucks and equipment over Easement No. 1, Shady Side Drive, which is a hilly and curvy two-lane road with no sidewalks or shoulders. *Id.* at 54-55.

[14] On April 18, 2018, Cain filed his complaint for declaratory judgment and injunctive relief. In the complaint, Cain requested declaratory judgment to determine the rights granted to the Huffs by the Grant of Easement and for a declaration that the easements do not authorize ingress and egress for commercial logging activity on the Huff Real Estate. *Appellants' App. Vol. 2* at 15. Cain also requested a permanent injunction against the Huffs, enjoining use of the easements for commercial logging activities or any purpose other than

specifically authorized by the general conditions in the Grant of Easement. *Id.* at 16. On April 20, 2018, Cain filed a petition for a temporary restraining order ("TRO") to enjoin the Huffs' logging. The trial court denied the TRO petition after a hearing but set the matter for a hearing on a preliminary injunction. Logging activities on the Huff Real Estate greatly increased after the TRO hearing.

[15] On May 3, 2018, a hearing was held on the issue of a preliminary injunction. At the hearing, Cain presented evidence that he is a member of The Shores Homeowners' Association and owned property in The Shores. Cain testified that he objected to the Huffs' use of the easements to remove logs from the Huff Real Estate for commercial sale even if for the development of single-family homes. *Tr.* at 78. Cain further testified, "I feel like these logging trucks and this machinery are trespassing across the easements because they don't have permission to be there." *Id.* at 90. Cain also presented evidence that the use of logging trucks on the easements is an annoyance and inconvenience to him, although he only lives in his home in The Shores approximately four months out of the year. *Id.* at 80, 89. Cain testified that he had safety concerns regarding the logging trucks using the easements and introduced a picture of a neighbor standing behind a mailbox as a logging truck passed, but Cain did not have any knowledge of any accidents occurring on Shade Side Drive in the years since he has owned his property. *Id.* at 85.

[16] Cain also presented testimony of Alice Sharp ("Sharp"), a neighbor of Cain, but not a resident of The Shores. Sharp testified that she lives three houses north of

Cain on Shady Side Drive and is familiar with The Shores from going on walks and visiting people who lived there, but that she is not a member of The Shores. *Id*. at 53-54. Sharp further testified that on one occasion when the logging trucks were using Shady Side Drive, she had to pull her car to the shoulder when a truck came around a curve in the road. *Id*. at 54-55. She also stated that the logging activity has "definitely slowed down pedestrian traffic." *Id*. at 55. After testifying on direct examination that she had "seen lots of logging trucks and equipment" on Shady Side Drive, Sharp testified on cross-examination that she only witnessed approximately six logging trucks pass through Shady Side Drive over the course of the prior two weeks. *Id*. at 54, 57.

[17] At the hearing, William J. Huff ("William") testified that, although he was clearing trees from the Huff Real Estate, he was not in the process of building homes on the land; instead, he was "preparing for the future use of [the] land." *Id*. at 100. The evidence presented at the hearing included William's statement that the logging activity on the Huff Real Estate at the time the complaint was filed was to remove trees in accordance with the Stewardship Plan. *Id*. at 111. In discussing what is necessary for future development, the Huffs presented testimony from a civil engineer that the "standard first step in a development project is clearing" the land. *Id*. at 131. After reviewing the relevant portions of the Grant of Easement, the civil engineer testified that the development and use of the Huff Real Estate would include "clearing and grading, establishment of building sites for these buildings," the extension of utility lines, and building of homes and garages. *Id*. at 134. The engineer further testified that, as part of

this process, any valuable timber that is removed during the clearing could be sold to help offset costs. *Id*. at 135.

[18] William testified that he understood that the process of harvesting the timber would only continue for a period of about eight weeks, depending on weather, and that harvesting would not need to be done again for approximately ten years. *Id*. at 122-23. Evidence was presented that, once the timber was harvested, a ten to fifteen-year rotation was expected before harvesting needed to occur again but was dependent on the growth rate of the timber and the presence of diseases or other outside forces. *Id*. at 173, 182.

[19] The Huffs presented evidence that their contract for selective harvesting with Tri-State was worth approximately $500,000, but they did not show what percentage of that value they were to receive from Tri-State. *Id*. at 117. The Huffs also maintained that they would incur penalties and fees associated with the cessation of work under their contract with Tri-State and that timber worth $20,000 had already been cut on their land and would spoil if not removed. *Id*. at 117, 184-85.

[20] On May 8, 2018, the trial court entered its order granting Cain relief and prohibiting the Huffs from using the easements for anything other than the construction, development, and use of single-family structures. *Appellants' App. Vol. 2* at 106-11. The trial court specifically ordered that the Huffs were enjoined from "using the [easements] through The Shores . . . for access to [the Huff Real Estate] except for the construction, development and use by [the

Huffs] of single-family residential structures, which may include guest and caretaker quarters and other buildings attendant thereto." *Id*. at 110. The trial court further enjoined the Huffs from "use of the [easements] described in the Grant of Easement, which encumber [the Huff Real Estate,] for commercial logging or for hauling logs or trees, or forestry activity." *Id*. The Huffs now appeal.

## Discussion and Decision

[21] "The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion." *Duke Energy of Ind., LLC v. City of Franklin*, 69 N.E.3d 471, 481-82 (Ind. Ct. App. 2016). When granting a preliminary injunction, a trial court is required to enter special findings and conclusions thereon. Ind. Trial Rules 52, 65(D). When considering whether a trial court's grant of a party's motion for a preliminary injunction constitutes an abuse of discretion, this court determines whether the evidence supports the trial court's special findings of fact and whether the findings support the judgment. *Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*, 64 N.E.3d 863, 874 (Ind. Ct. App. 2016). This court should not disturb the findings or judgment unless they are clearly erroneous, nor should the court reweigh the evidence or reassess witness credibility. *Id*. Rather, the court should consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id*. We will reverse the trial court's judgment only when it is clearly erroneous,

and a judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.*

[22] To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that: (1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved by the granting of the injunction. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.,* 784 N.E.2d 484, 487 (Ind. 2003). In order to grant a preliminary injunction, the moving party has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle him to injunctive relief. *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*, 826 N.E.2d 49, 62-63 (Ind. Ct. App. 2005). The power to issue a preliminary injunction should be issued sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor. *Id.* at 63.

[23] The Huffs argue that the trial court abused its discretion when it granted the preliminary injunction prohibiting them from harvesting timber from the Huff Real Estate. Specifically, the Huffs contend, in part, that the trial court's grant of a preliminary injunction was an abuse of discretion because the preliminary injunction was overbroad. The Huffs assert that the preliminary injunction was not narrowly tailored and was broader than reasonably necessary to protect

Cain's interest because it prevents them from using the easements to exercise their rights on the Huff Real Estate.

[24] An injunction is an extraordinary remedy that should be granted only with caution. *Rennaker v. Gleason*, 913 N.E.2d 723, 733 (Ind. Ct. App. 2009). Injunctions must be narrowly tailored and never more extensive in scope than is reasonably necessary to protect the interests of aggrieved parties. *Id.* Moreover, the injunction should not be so broad as to prevent the enjoined party from exercising his rights. *U.S. Land Servs.*, 826 N.E.2d at 65 (citing *Boczar v. Meridian St. Found.*, 749 N.E.2d 87, 94 (Ind. Ct. App. 2001)). If an injunction is more extensive than is reasonably necessary to protect a party's interests or unduly prevents a party from exercising his rights, we may remand to the trial court for revision. *Id.*

[25] Here, the trial court granted a preliminary injunction and ordered the following:

> [T]hat Defendants and Defendants' agents, employees, attorneys and all others under Defendants' control and in active concert and participation with Defendants be restrained and enjoined from trespass on Plaintiffs' Real Estate and specifically are restrained and enjoined from using the Access Easements through The Shores subdivision for access to Defendants' Real Estate except for the construction, development and use by Defendants or Defendants' grantees and assigns of single family residential structures, which may include guest and caretaker quarters and other buildings attendant thereto to be located on Defendants' Real Estate . . .
>
> [T]hat Defendants and Defendants' agents, employees, attorneys and all of those under Defendants' control and in active concert

and participation with Defendants be restrained and enjoined
from use of the Access Easements described in the Grant of
Easement, which encumber Defendants' Real Estate and
Plaintiffs' Real Estate for commercial logging or for hauling logs
or trees, or forestry activity.

*Appellants' App. Vol. 2* at 110.

[26] The language in the first paragraph of the order closely mirrors the language used in the General Conditions of the original Grant of Easement, which provided, "Grantee covenants to limit use of the easements above described, for the construction, development and use by Grantee and its grantees and assigns of six (6) single family residential structures, each of which may include guest and caretaker quarters and other buildings attendant thereto." *Id*. at 31. However, the language in the second paragraph goes further and enjoins the Huffs from using the easements for commercial logging, hauling logs or trees, or any forestry activity. The Huffs assert that this preliminary injunction encroaches on their ability to exercise their rights on their property. We agree.

[27] The phrase "forestry activity" was not defined by the trial court. However, Indiana Code section 32-30-6-1.5 defines the phrase "forestry operations" as "facilities, activities, and equipment used to plant, raise, manage, harvest, and remove trees on private land . . . [and] includes site preparation, fertilization, pest control, and wildlife management." Therefore, the language in the second paragraph appears to prohibit the Huffs from utilizing the easements for any activity associated with planting, managing, harvesting, and removing trees from the Huff Real Estate. Under the language in the Grant of Easement, the

Huffs' use of the easements was limited to the construction, development, and use by the Huffs and their grantees and assigns of six single-family residential structures. The evidence presented established that the Huff Real Estate is comprised of approximately 240 acres adjacent to The Shores, which consists of heavily wooded and hilly land with the only access by land being the three access easements granted in the Grant of Easement. In order for reasonable development or use of the Huff Real Estate, it is clear that some prudent logging and removal of trees will be necessary and that the hauling and removal of trees would be essential in developing the Huff Real Estate as contemplated in the Grant of Easement. We, therefore, conclude that the preliminary injunction ordered by the trial court was overbroad as it enjoined the Huffs from activities on the Huff Real Estate that would be necessary to develop the property and effectively prohibits them from accomplishing what is explicitly granted in the Grant of Easement. Based on this, we vacate the trial court's order granting the preliminary injunction.

[28] Although William testified that he was not in the process of building homes on the land but was "preparing for the future use of [the] land," Cain testified that he objected to the Huffs' use of the easements to remove logs for commercial sale even if for the development of single-family homes. *Tr.* at 78, 100. Based on the evidence presented, we recommend that this case be referred to mediation to allow the parties to hopefully find a middle ground in this dispute. Prudent logging of the Huff Real Estate is essential for the reasonable use and development of the property, and as the Huff Real Estate is landlocked, the

easements will need to be used to facilitate this prudent logging. Some sort of middle ground should be sought between the parties to accomplish this end, and this court urges the trial court to consider on remand whether the covenants on which a middle ground cannot be found are contrary to law and should be vacated.

Vacated and remanded.

Vaidik, C.J., concurs.

Riley, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

William J. Huff, II Revocable Trust Declaration, Dated June 28, 2011 and Nicole E. Huff Revocable Trust Declaration, Dated June 28, 2011,

*Appellants-Defendants,*

v.

Michael O. Cain and Linda A. Raymond,

Appellees-Plaintiffs.

Court of Appeals Case No. 18A-PL-1123

---

**Riley, Judge dissenting**

[30] I respectfully dissent from the majority's conclusion that the preliminary injunction crafted by the trial court was overbroad. Preliminary and permanent injunctions serve different purposes and may, therefore, have different scopes. *AGS Capital Corp., Inc. v. Product Action Intern., LLC*, 884 N.E.2d 294, 313-14

(Ind. Ct. App. 2008), *trans. denied*. One of the purposes of a preliminary injunction is to protect the property and rights of the parties from any injury, usually by maintaining the status quo as it existed prior to the controversy, until the issues and equities in a case can be determined after a full examination and hearing. *Id*. at 314. For purposes of a preliminary injunction the status quo is usually defined as "the last actual, peaceful and noncontested status which preceded the pending controversy." *Kozuch v. CRA-MAR Video Ctr., Inc.*, 478 N.E.2d 110, 115 (Ind. Ct. App. 1985).

[31] The trial court's order prohibited the Huffs from using the Easements for "commercial logging or for hauling logs or trees, or forestry activity." (Appellants' App. Vol. II, p. 110). It is this last term which the majority finds to be overbroad. However, at the preliminary injunction hearing, the Huffs maintained that their commercial logging operations were part of the implementation of a forestry plan they had developed by the DNR. Regardless of their motives in logging their land, the logging is what precipitated the controversy between the parties. The trial court's inclusion of the term "forestry activity" was a reasonable description of the implementation of the forestry plan the Huffs described, and so I disagree with the majority that the term was overbroad for the purpose of preserving the status quo between the parties. Furthermore, while I agree with the majority that the Grant of Easement furnished the Huffs with the right to use the Easements to construct, develop, and use six single-family residential structures, it was undisputed that the Huffs were not in the process of constructing, developing or using

residential structures when they undertook their commercial logging activities. Therefore, I disagree with the majority that the trial court's order prohibited the Huffs from exercising their rights.

[32] Although the issues were not addressed by the majority, I find that Cain demonstrated that irreparable harm would result from the Huffs' commercial logging, he had a reasonable likelihood of success on the merits of his claim, and that the public interest would not be disserved by a preliminary injunction on the Huffs' commercial logging pending a full examination and hearing on the issues. Therefore, I would affirm the trial court's grant of preliminary injunctive relief to Cain.

[33] In its decision the majority recommends "that this case be referred to mediation to allow the parties to hopefully find a middle ground in this dispute" and urges "the trial court to consider on remand whether the covenants on which middle ground cannot be found are contrary to law and should be vacated." (Opinion p. 16-17). I find that these observations are imprudent in that they border on offering an opinion on ongoing litigation and overstep our role in this review of a grant of preliminary injunctive relief. For these reasons, I dissent.