

FILED

Nov 25 2020, 8:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

F. Paganelli
Caroline E. Richardson
Stephanie L. Grass
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Wayne C. Turner
Michael R. Limrick
Kenneth J. Munson
Che'lee A. John
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Abercrombie and Fitch Stores, Inc.<br>*Appellant-Defendant,*<br><br>v.<br><br>Simon Property Group, L.P.,<br>*Appellee-Plaintiff.* | November 25, 2020<br><br>Court of Appeals Case No.<br>20A-CT-1092<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Heather A. Welch, Judge<br><br>Trial Court Cause No.<br>49D01-2004-PL-13294 |

**Altice, Judge.**

# Case Summary

[1] Abercrombie & Fitch Stores, Inc. (Abercrombie) appeals the trial court's grant of a preliminary injunction in favor of Simon Property Group, L.P. (Simon) that prohibited Abercrombie from permanently closing its retail stores in Simon malls. Abercrombie claims that the trial court improperly entered a mandatory injunction rather than granting prohibitory injunctive relief because Abercrombie was ordered to take more action than was necessary to preserve the status quo. Abercrombie also contends that the trial court abused its discretion because the evidence did not show that Simon was likely to prevail on the merits of its breach of contract claims at trial, and there was no showing that Simon would suffer irreparable harm if injunctive relief was not granted.

[2] We affirm.

## Facts and Procedural History

[3] Abercrombie operates retail clothing stores throughout the United States in Simon malls. Over the past several years, the parties have negotiated groups of new and renewal leases in "packages" that establish terms for multiple stores. *Appellant's Brief* at 6.

[4] The parties began negotiating fifty-four lease agreements in early February 2019, that involved various lease terms and store relocations (Agreement). Johnny Ciotola, Abercrombie's store director, negotiated the terms for Abercrombie and its in-house legal counsel, Jennifer Mason, was responsible

for finalizing the documentation. Pervis Bearden and Daniel Seabaugh negotiated the terms for Simon, and attorney Elizabeth Young would confirm the final terms. During the course of the year, the parties discussed the leases and the terms of a settlement agreement regarding the resolution of a rent dispute. Most of the leases had either expired or were due to expire by the end of January 2020.

[5] On January 14, 2020, Ciotola sent an email to Bearden stating that "per our most recent communication(s), we can agree to the [attached] package terms that is understood by both parties to be the final position." *Appellant's Appendix Vol. II* at 11, 189-94. That email set forth the length of each lease, Abercrombie's rent obligation, the terms upon which Abercrombie would open new stores, and the location of the stores that would be closing. Ciotola and Mason each confirmed that this email contained all "major points" of the parties' dealings. *Appellant's Appendix Vol. V* at 11.

[6] On January 15, Young and Mason confirmed that a "bunch of deals [had been] approved" following "very thorough negotiations," and that they would begin drafting the conforming documents. *Appellant's Appendix Vol. III* at 41. Abercrombie and Simon representatives continued to exchange emails about some of the non-substantive lease provisions. All of Simon's email responses included language stating that "to be enforceable by or against a party, a final agreement between the parties must also be written and signed by both parties." *Exhibit A-2.*

[7] On January 23, 2020, Mason acknowledged that she had received a draft of the lease documentation from Young. It was her understanding that an "agreement [was] reached between [the parties and] documented in [the January 14] email" from Ciotola to Bearden. *Exhibit* 2.

[8] The Agreement provided, among other things, that Abercrombie would pay Simon nearly $450,000 less per month in combined rent for its stores than it had in the prior year. Although Simon did not sign a document entitled, "Renewal Rents Letter," Abercrombie paid—and Simon accepted—the rent amounts contemplated in the Agreement, starting in February 2020. Abercrombie was also permitted to continue occupying all the stores that were subject to the Agreement, rather than having to close the stores whose leases would have expired on January 31, 2020.

[9] Although Abercrombie closed five of its stores as contemplated in the Agreement, the parties continued negotiating amendments to the Agreement into early March 2020, and they revised some non-substantive terms in several leases. Each time one of Simon's attorneys forwarded a proposed amendment to Abercrombie, the attached documents were prefaced with the following language: "If the amendment is in acceptable form, please have two (2) clean, legal sized copies of the amendment executed and return both copies to my attention at your earliest convenience, and I will thereafter return a fully-executed original for your files." *Appellant's Appendix Vol. V* at 60.

[10]    By March 10, Abercrombie had completed edits on the remaining lease documents, and Mason encouraged Young to have the documents executed "as quickly as possible." *Appellant's Appendix Vol. III* at 39, 51. On March 13, Simon accepted Abercrombie's final proposed language to the Agreement. Thereafter, Mason was provided with an "execution-ready" version of the Agreement that contained no material deviations from the original and essential terms that were included in Ciotola's January 14, 2020 email. *Id.* at 16.

[11]    Also on March 13, Abercrombie sent Simon the executed lease amendments with Abercrombie representatives' original handwritten signatures in three separate packages. These documents represented forty-two of the fifty-four stores that had been the subject of the original negotiations. As with past correspondence, the cover letters in each package provided that "the documents have been originally signed by Tenant. Upon counter-execution by landlord, please return one fully executed original copy. . . ." *Appellant's Appendix Vol. 5* at 57-59. Although Abercrombie had sent these executed documents to Simon, Abercrombie decided to close all stores effective March 16, 2020, because of the COVID-19 pandemic.[1]

[12]    Beginning at 4:20 p.m. on March 17, 2020, Simon began sending electronically signed copies of the lease amendments to Abercrombie by email. On March 18, Simon announced that it was temporarily closing its malls across the

---

[1] The evidence does not reflect whether Abercrombie communicated its decision to close the stores to Simon at this point.

country after discussing the spread of COVID-19 with federal state and local officials. That same day, Abercrombie sent a letter to Simon formally retracting the signatures on forty-two leases and amendments. Abercrombie's only stated reason for the retraction was "the current uncertainty regarding the impact of COVID-19." *Id.* at 203. Abercrombie also stated that the Agreement "*shall be of no further force or effect*." *Id.* (Emphasis added).

[13] Abercrombie did not provide Simon with executed copies of the remaining lease documents or the settlement document contemplated under the Agreement. Simon rejected Abercrombie's retraction on the grounds that Abercrombie had repeatedly confirmed the Agreement, and that the parties had been fully performing under the Agreement for nearly two months.

[14] Notwithstanding Abercrombie's retraction letter, Simon continued forwarding executed documents to Abercrombie for signature. By March 20, 2020, Abercrombie had paid its second month of rent at the lower rate under the Agreement. On March 27, Abercrombie sent notices of termination to landlords at the locations where the leases had expired on or before January 31, 2020. Abercrombie instructed the landlords to consider the leases as month-to-month tenancies from that day forward.

[15] On April 7, 2020, Simon filed a complaint against Abercrombie, seeking a declaratory judgment that the Agreement was valid and enforceable. Simon also sought damages and specific performance for Abercrombie's breach of the Agreement.

[16]    Three weeks later, Abercrombie made clear its intention to permanently close and abandon the stores that were included in the Agreement. In response, Simon sought a temporary restraining order and a preliminary injunction on April 27, 2020, seeking to prohibit Abercrombie from permanently closing its stores. The trial court granted an emergency temporary restraining order in Simon's favor on May 1, 2020.

[17]    Following a hearing on the motion for preliminary injunction on May 8, 2020, the trial court granted Simon's motion and ordered Abercrombie not to permanently close its stores. The trial court set a bond at $15 million and determined that (a) Simon established a *prima facie* case that there was an enforceable Agreement; (b) Abercrombie's sudden closures would cause Simon irreparable harm; (c) the threatened irreparable harm to Simon outweighed any potential pecuniary harm to Abercrombie resulting from an injunction; and (d) the public interest would not be disserved by the granting of an injunction.

[18]    The trial court's order provided that

> A. Abercrombie & Fitch Stores, Inc., its agents, successors, parent, subsidiary or affiliate companies, and all those persons and entities in active concert or participation with them are ENJOINED, in any manner, either directly or indirectly from:
>
> > i. removing all inventory, all fixtures, or all equipment from the 53 stores at issue in this action for the purpose of closing those stores; however, [Abercrombie] stores can reallocate its inventory to other stores or to reserve for online sales but must maintain sufficient amounts of

inventory in each store to operate per the terms of its lease; and

ii. otherwise abandoning the 53 stores at issue in this action pursuant to A&F Stores' unilateral declaration that the leases for those stores have terminated. [Abercrombie] stores should operate per the terms of the lease documents drafted pursuant to the [Agreement], thereby maintaining the status quo.

*Appellant's Appendix Vol. 2* at 45-46. Abercrombie now appeals.

# DISCUSSION AND DECISION

## I. Standard of Review

The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and appellate review is limited to whether there was a clear abuse of that discretion. *Indiana Family & Social Servs. Admin. v. Walgreen Co.,* 769 N.E.2d 158, 161 (Ind. 2002). When considering whether a trial court's grant of a party's motion for a preliminary injunction constitutes an abuse of discretion, this court determines whether the evidence supports the trial court's special findings of fact and whether the findings support the judgment. *Hannum Wagle & Cline Engineering, Inc. v. American Consulting, Inc.,* 864 N.E.3d 863, 874 (Ind. Ct. App. 2016). Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* A judgment is clearly erroneous when a review of the record leaves the

reviewing court with a firm conviction that a mistake has been made. *Robert's Hair Designers, Inc. v. Pearson*, 780 N.E.2d 858, 863 (Ind. Ct. App. 2002).

[19] This court has determined that

> An injunction is an extraordinary remedy that should be granted only with caution. Injunctions must be narrowly tailored and never more extensive in scope than is reasonably necessary to protect the interests of aggrieved parties. Moreover, the injunction should not be so broad as to prevent the enjoined party from exercising his rights. If an injunction is more extensive than is reasonably necessary to protect a party's interests or unduly prevents a party from exercising his rights, we may remand to the trial court for revision.

*William J. Huff, II Revocable Trust Declaration, Dated June 28, 2011 v. Cain,* 120 N.E.3d 1029, 1086 (Ind. Ct. App. 2019) (internal citations omitted).

[20] We note that the purpose of a preliminary injunction is to maintain the status quo. *AGS Capital Corp. v. Product Action Int'l, LLC,* 884 N.E.2d 294, 314 (Ind. Ct. App. 2008), *trans. denied.* To obtain a preliminary injunction, the moving party must show by a preponderance of the evidence that: (1) its remedies at law are inadequate and that irreparable harm will occur during the pendency of the action as a result; (2) it has at least a reasonable likelihood of success on the merits by establishing a prima facie case; (3) the threatened harm it faces outweighs the potential harm the injunction would pose to the non-moving party; and (4) the public interest would not be disserved by granting the injunction. *Coates v. Heat Wagons, Inc.,* 942 N.E.2d 905, 911-12 (Ind. Ct. App. 2011). Reversal of an injunction on the "likelihood of success" factor is

warranted only if "the likelihood of success is so improbable as to render the trial court's determination erroneous as a matter of law." *Norlund v. Faust*, 675 N.E.2d 1142, 1149 (Ind. Ct. App. 1997), *trans. denied*.

## II. Abercrombie's Claims

### A. Prohibitory vs. Mandatory Injunction

[21] Abercrombie claims that the trial court's order must be set aside because it erred in issuing an "improper mandatory injunction." *Appellant's Brief* at 31. More particularly, Abercrombie asserts that the trial court erroneously construed the status quo position of the parties as being the period prior to Abercrombie's March 16 decision to close all stores. Abercrombie contends that March 17, 2020, was the appropriate date that the trial court should have considered, which was just prior to Simon's filing of the action and when its stores were already temporarily closed due to pandemic concerns. Hence, Abercrombie asserts that the trial court's order improperly compelled it to take an action and engage in an activity that it had not otherwise been doing, i.e., reopen nearly fifty stores that it had already closed.

[22] The status quo of the parties is determined as of the "last, actual, peaceful, and non-contested status which preceded the pending controversy." *Hannum,* 64 N.E.3d at 883. Under this test, Abercrombie's argument that the final pre-dispute status occurred when Abercrombie's stores were temporarily closed because of COVID-19 mischaracterizes the issue before the trial court and ignores the trial court's findings based on the evidence.

[23]   The parties had been performing under the Agreement for nearly two months before the COVID-19 pandemic prompted a temporary closure of Simon malls. The circumstances here have nothing to do with the temporary, government-ordered closures. Rather, it was Abercrombie's threat to *permanently* close and abandon its stores on the theory that there was no binding contract between the parties that prompted Simon's request for an injunction. Simon requested injunctive relief prohibiting the permanent closures. Hence, contrary to Abercrombie's claim, the trial court's order was not an improper mandatory directive. In other words, the injunctive relief granted for Simon did not order Abercrombie to reopen its stores in defiance of the temporary closures that the government had ordered because of the COVID-19 crisis. The temporary injunction merely prohibited Abercrombie from permanently closing its stores and abandoning those locations. Thus, Abercrombie's mandatory injunction argument fails.

## B.  Appropriateness of Relief

[24]   Abercrombie contends that the trial court abused its discretion in granting injunctive relief for Simon because the evidence failed to show that Simon will prevail on the merits at trial. Notwithstanding Abercrombie's claim, Simon's burden was to present substantial evidence at the injunction hearing establishing that it had a reasonable likelihood of success at trial. *IHSAA v. Martin*, 731 N.E.2d 1, 7 (Ind. Ct. App. 2000), *trans. denied*. Put another way, Simon was not required at the preliminary injunction stage to show that it was "entitled to relief as a matter of law." *Norlund*, 675 N.E.2d at 1149.

[25] We note that absolute certainty of all contract terms is not required for a contract to be enforceable. Rather, the parties must only agree to the essential terms to render an agreement enforceable. *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc*, 906 N.E.2d 805, 813 (Ind. 2009). Additionally, the parties' performance under an agreement will amount to an unambiguous and overt admission by both parties that a contract existed. *Int'l Creative Mgmt, Inc. v. D & R Entm't Co.,* 670 N.E.2d 1305, 1313 (Ind. Ct. App. 1996), *trans. denied.*

[26] In this case, the evidence established that Ciotola's email of January 14, 2020 to Bearden stated the essential terms for each lease at issue. Abercrombie acknowledged that the email included the "major points of the parties' ongoing discussions to which Abercrombie could agree," including the new rent rate and lease extensions. *Appellant's Brief* at 8. The parties intended to be bound by the Agreement as shown by Abercrombie's repeated statements that it had reached an agreement with Simon and that negotiations were complete. Notwithstanding the disclaimer language set forth in the parties' email exchanges, Abercrombie kept its stores open after January 31, 2020, and it paid the decreased rent amount for two months under the Agreement. Simon accepted the lower rent payments, and Abercrombie proceeded with its store relocation plans and closures contemplated by the Agreement.

[27] The parties went on to prepare and finalize all lease documentation, Simon approved the final draft of the rent-dispute settlement agreement that Abercrombie had distributed, and Abercrombie executed forty-three lease

agreements that the parties had negotiated before this dispute began.

[28] In light of this evidence, we conclude that Simon has presented *prima facie* evidence of an enforceable Agreement. The evidence supports the trial court's findings, and the trial court's judgment is supported by the findings. Thus, the trial court did not abuse its discretion in concluding that Simon established a likely chance of success at trial proving that Abercrombie's intention to close their stores before the lease extensions expired —along with its failure to make the agreed-upon rent payments—would constitute a breach of the Agreement. *See Wolvos v. Meyer,* 668 N.E.2d 671, 678 (Ind. 1996) (finding that the parties agreed to certain enforceable terms of an agreement with the expectation that they would execute a complete agreement in the future, and "a mere reference to a more formalized contract does not void the presently existing agreement").

[29] Abercrombie also argues that the preliminary injunction must be set aside because Simon failed to show that it would be subject to irreparable harm in the absence of an injunction. Simon's initial burden was to demonstrate that "remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action." *Ind. Family & Soc. Svcs. Admin. v. Walgreen, Inc.,* 769 N.E.2d 158, 162 (Ind. 2002). Irreparable harm is that harm which cannot be compensated for through damages upon resolution of the underlying action. *Coates,* 942 N.E.2d at 912. The test is whether later money damages would be "as full and adequate as the equitable remedy." *Barlow v. Sipes,* 744 N.E.2d 1, 6 (Ind. Ct. App. 2001), *trans. denied.* Injunctive relief may be granted if it is more practicable, efficient, or adequate than the remedy

afforded by law. *Crossman Communities, Inc. v. Dean*, 767 N.E.2d 1035, 1041-42 (Ind. Ct. App. 2002). One purpose of a preliminary injunction is to prevent harm to the moving party that could not be corrected by a final judgment. *Id.*

[30] In support of its claim, Abercrombie notes that even though some of its stores vacated Simon malls from 2016 – 2018, Simon was able to generate significant profits during that time. But in that instance, the trial court observed that those circumstances arose when the closures had been negotiated and there was time to locate replacement tenants. More specifically, thirty-three stores closed over the course of two years as part of ongoing negotiations, whereas here, Abercrombie threatened to permanently close more than fifty stores without notice.

[31] Additionally, the trial court's finding that Abercrombie could pay the remaining amounts under the leases does not mean that the payment of those amounts would constitute a complete remedy. The trial court considered evidence presented by Simon's expert, John Talbott, a professor at Indiana University's Kelley School of Business.[2] Talbott averred that shopping centers derive their success from a mix of tenants, and the stores agree to be open when the malls are. Talbott explained that the sudden closure of Abercrombie stores would

---

[2] Although Abercrombie alleges that the trial court erroneously relied on Talbott's affidavit, it offers no cogent argument in support of that conclusion, and it did not object to the admissibility of his testimony. In any event, Talbott's affidavit establishes that he was qualified to testify about the harm that Simon would suffer following a mass shutdown of Abercrombie's stores.

suggest to many that the shopping center is in trouble. And even in ordinary times, such closures would have a harmful effect on Simon and other mall tenants.

[32]     Talbott noted that sudden closures by known retailers would impose significant stress on Simon to retain and attract other tenants. He also opined that customers who consider returning to temporarily closed Simon malls because of COVID-19 will respond negatively if nationally recognized stores are not included in the mall shopping experience when the pandemic ends. If other companies were permitted to vacate their premises only because of the pandemic, Talbott reasoned that other tenants might very well be tempted to suddenly depart when considering whether to renew their leases.

[33]     Talbott explained that Simon will experience a multi-year battle in adjusting the manner that its malls operate because of COVID-19 concerns. Talbott believed that Abercrombie's decision to abandon and close its stores cannot be accurately determined and calculated; however, he indicated that the damages Simon would suffer without an injunction were substantial and beyond what could be remedied merely by Abercrombie's payment of a judgment for unpaid rent.

[34]     Given this evidence, it was reasonable for the trial court to conclude that Abercrombie's sudden decision to vacate and permanently close its stores would present irreparable harm to Simon. Thus, the indirect effects of a mass store closing, along with the consequences of the pandemic, supports the trial

court's grant of injunctive relief until a final judgment on the merits may be rendered.

[35] Judgment affirmed.

Riley, J. and May, J., concur.